RECEIVED

MAR 1 1 2002

KENNETH J. MURPHY, Clerk
DAYTON OHIO

 1            UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
 2                 WESTERN DIVISION

 3       B. BACH,

 4            Plaintiff,

 5       vs.                    CASE NO.:  C 3 01-191

 6       FIRST UNION NATIONAL BANK,    Judge Dlott
         et al.,
 7
              Defendants.
 8
         _____
 9

10            Deposition of FERNANDO DURAND, taken on

11       behalf of the Plaintiff, pursuant to Notice of Taking

12       Deposition in the above-entitled action, on January 9,

13       2002, at 2:10 p.m., at 7960 Arlington Expressway, 4th

14       Floor, Jacksonville, Florida, before Terrie L. Cook,

15       RPR, CRR, CSR (GA), Notary Public in and for the State

16       of Florida at Large.

17

18       APPEARANCES:

19            MICHAEL C. ECKERT, Esquire, Attorney for
                   Plaintiff, via telephone.
20
              JOHN C. DEAL, Esquire, Attorney for Defendants,
21                 via telephone.

22

23       Deposition used/Trial: ___12/8/03___

24       Deposition used/Hearing: _____

25       Depo for Dispositive Mtns: _12/6/02REb_ MSJ

1    I N D E X

2    WITNESS

3    FERNANDO DURAND

4        DIRECT EXAMINATION BY MR. ECKERT........ 4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T S

 2

 3    FOR IDENTIFICATION

 4    PLAINTIFF'S EXHIBIT A....... 7

 5    PLAINTIFF'S EXHIBIT B....... 9

 6    PLAINTIFF'S EXHIBIT C....... 86

 7    PLAINTIFF'S EXHIBIT D....... 16

 8    PLAINTIFF'S EXHIBIT E....... 57

 9    PLAINTIFF'S EXHIBIT F....... 93

10    PLAINTIFF'S EXHIBIT G....... 100

11    PLAINTIFF'S EXHIBIT H....... 112

12    PLAINTIFF'S EXHIBIT I....... 114

13    PLAINTIFF'S EXHIBIT J....... 116

14    PLAINTIFF'S EXHIBIT K....... 117

15    PLAINTIFF'S EXHIBIT L....... 119

16    PLAINTIFF'S EXHIBIT M....... 121

17    PLAINTIFF'S EXHIBIT N....... 122

18    PLAINTIFF'S EXHIBIT O....... 124

19    PLAINTIFF'S EXHIBIT P....... 125

20    PLAINTIFF'S EXHIBIT Q....... 127

21    PLAINTIFF'S EXHIBIT R....... 129

22

23

24

25
```

1                      S T I P U L A T I O N

2          It was stipulated and agreed by and between counsel

3     for the respective parties, and the witness, that the

4     reading and signing of the deposition by the witness

5     not be waived.

6                            -   -   -

7                        FERNANDO DURAND,

8     having been produced and first duly sworn as a witness,

9     testified as follows:

10                     DIRECT EXAMINATION

11    BY MR. ECKERT:

12         Q    Could you please state your full name for the

13    record, please?

14         A    Fernando Durand.

15         Q    And do you have any trouble hearing me today?

16         A    I hear you fine.

17         Q    Okay.  Great.  What is your current

18    occupation?

19         A    Current occupation is recovery coordinator for

20    First Union National Bank.

21         Q    Okay.  And are you an attorney?

22         A    No, sir.

23         Q    Okay.  Do you have any legal training?

24         A    Only to the extent of, you know, whatever I've

25    picked up on the job.

```
 1        Q    Okay.  You understand I represent Dorothy

 2    Bach?

 3        A    Correct.

 4        Q    Okay.  Who is a resident of Ohio?

 5        A    Correct.

 6        Q    And that this testimony is in the case with --

 7    that she has filed against First Union?

 8        A    Correct.

 9        Q    Okay.  If you have any questions during the

10    deposition, please stop me, let me know and I'll try to

11    -- I'll try to answer the best I can.  If you need to

12    take a break at any time, please just say so and -- and

13    I'll accommodate you.  If you don't tell me that --

14    that my question is unclear or you don't tell me that

15    you didn't understand my question, I'm going to assume

16    that you did; is that fair?

17        A    Yes, it is.

18        Q    Okay.  Do you have some exhibits in front of

19    you or documents in front of you that I have forwarded

20    down to your office?

21        A    Yes, I do.

22        Q    Okay.  And do you also have some documents

23    that Mr. Deal forwarded to you?

24        A    Yes.  From Mr. Deal, I have 238 through 514, I

25    believe.
```

1      Q    Okay.  Let's -- let's start with documents

2    numbered 1 through 237.  Do you have those?

3      A    I have them in front of me, yes.

4      Q    Okay.  Have you seen those documents before?

5      A    Yes.

6      Q    Okay.  And can you just briefly tell me what

7    those documents generally consist of?

8      A    I see credit card statements, that would be

9    document 2 through 13.

10     Q    Okay.  Let me -- let me stop and maybe we can

11   do this a little bit quicker.

12     A    Sure.

13     Q    In your review of these documents, are there

14   any of these documents that aren't authentic copies of

15   documents maintained by First Union?

16     A    No, sir, all of these documents are First

17   Union documents.

18     Q    Okay.  And is that also true for documents 238

19   through 514?

20     A    That is correct, sir.

21     Q    Okay.  And is that also true for documents 515

22   through 590?

23     A    That is correct.

24     Q    Okay.  And to the best of your knowledge, are

25   there any documents that have been assigned numbers

Hedquist & Associates Reporters, Inc.

```
 1    such as at the bottom of the right-hand corner beyond

 2    Number 590?

 3         A    No.   Looking at what I have here, the last

 4    numbered document would be 590, sir.

 5         Q    Okay.  Great.  I want to start -- if we could,

 6    let's start in the beginning of the document.  And just

 7    -- just for purposes of clarification, I'd like to --

 8    I'd like to mark the first set as Exhibit -- Exhibit A,

 9    that's numbers 1 through 230 -- 237.

10         A    Okay.  Okay.  Do you want me to mark it?

11         Q    You can or the court reporter can, whichever

12    is agreeable to her.

13         A    Okay.

14              (Plaintiff's Exhibit A was marked for

15    identification.)

16         Q    Okay.  The first page, document number 1,

17    there's a category that says, Disputes.  What -- what

18    does that category mean?  It's in the middle of the --

19    in the middle of the page.

20         A    Yes, I see it and I'm not familiar with the

21    population of that field.

22         Q    Okay.  Do you know who would be familiar with

23    that?

24         A    To the best of my knowledge, I don't know of

25    anyone that -- that would.
```

Hedquist & Associates Reporters, Inc.

```
 1        Q    Okay.  This is a computer program that's used
 2   by First Union?
 3        A    Correct.  I do recognize this as a screen from
 4   the old FDR system.
 5        Q    Okay.  And is that system still -- still
 6   working at First Union?
 7        A    It is -- I believe that some accounts are
 8   currently housed on there.
 9        Q    Okay.
10        A    But to what extent, I -- I don't know.
11        Q    Okay.  Well, at some point in time, it appears
12   that there's a checking account that was opened up and
13   I have the name of Dorothy Bach on it, would you --
14   would you agree with that?
15        A    Correct.
16        Q    Okay.  Can you tell me how -- how Dorothy
17   Bach's name came to be on that account?
18        A    I don't know how her name came to be on the
19   account, but I did look at the statements for that
20   particular checking account --
21        Q    Right.
22        A    -- and I do notice that her name was on that
23   account, I believe, beginning the April '99 -- April
24   1999 statement.
25        Q    Okay.  Why -- why don't we turn, if we
```

1    could -- and we'll mark the second set of documents,

2    numbers 238 through 514, as Exhibit B.

3        A    Okay.

4            (Plaintiff's Exhibit B was marked for

5    identification.)

6        Q    Document number 238, do you recognize that

7    document?

8        A    It looks like it's a customer access

9    agreement.

10       Q    Okay. And that would be for, like, an ATM

11   card?

12       A    I believe that that's what it is for, yes.

13       Q    Okay. Are there any applications that you

14   have to sign when you open up a checking account with

15   First Union?

16       A    That is something that I'm, frankly, not --

17   not positive about.

18       Q    Have you ever seen any applications to open

19   up a checking account with Dorothy Bach's signature on

20   it?

21       A    I have not.

22       Q    Okay. And at the bottom of number 238, there

23   appears to be a signature of Heidi N. Bake, do you see

24   that?

25       A    Correct.

Hedquist & Associates Reporters, Inc.

```
 1        Q    And a date of 3/10/99?

 2        A    Yes.

 3        Q    Okay.  And then also the name and the address

 4   is Heidi Bake?

 5        A    Yes.

 6        Q    Okay.  If we could turn the page, document

 7   number 239 is a statement for that checking account; is

 8   it not?

 9        A    Yes, it is.

10        Q    Okay.  And at the top it lists Heidi N. Bake

11   and an address of Ocean Shore Boulevard, do you see

12   that?

13        A    Yes, I do.

14        Q    The statement is for 3/10/99 through 3/19/99?

15        A    Yes.

16        Q    Okay.  And Dorothy Bach's name doesn't appear

17   anywhere on that statement, does it?

18        A    That's correct, her name is not on the

19   statement.

20        Q    Okay.  Could we turn to the document 241?

21        A    Okay.

22        Q    This document at the top, it has both Heidi

23   Bake and Dorothy Bach's name on the account.

24        A    Correct.

25        Q    Okay.  And that's for 3/20 through 4/21/99?
```

Hedquist & Associates Reporters, Inc.

```
1         A    Correct.

2         Q    So at some point between 3/19/99 and 4/21/99,

3    Dorothy Bach got added to this checking account?

4         A    That is a correct assumption.

5         Q    Okay.  Do you have any documents or does First

6    Union have any documents or any computer information

7    that would indicate how Dorothy Bach's name got added

8    to that checking account?

9         A    None that I'm aware of.

10        Q    Okay.  Do you have any -- any knowledge as to

11   how her name got added to that checking account?

12        A    No, sir.

13        Q    Okay.  What are the different ways that First

14   Union allows people to be added to a checking account?

15        A    I am not -- am not positive what the branch

16   procedures are regarding that, sir.

17        Q    Okay.  Who would know that?

18        A    I guess the branch personnel.

19        Q    Okay.  Do you know if there's any kind of a

20   document that a person has to sign to be placed on

21   someone's checking account?

22        A    Not that I know of.

23        Q    Are there any policies in place at First Union

24   to prevent people from being added to other people's

25   checking accounts without their consent?
```

Hedquist & Associates Reporters, Inc.

```
 1        A      There may be policies, but I'm not aware if
 2   there are or not.
 3        Q      Okay.  Who would know that?
 4        A      Again, probably someone at the branch level, a
 5   branch manager perhaps would be the best to address
 6   that question.
 7        Q      Do you know what branch this checking account
 8   was opened up at?
 9        A      I do not.
10        Q      Is there any way to tell that?
11        A      Not that I know of, sir.
12        Q      Now, at some point in time First Union became
13   aware that my client was disputing that she had any
14   accounts with First Union, do you agree with that?
15        A      That is correct.
16        Q      Okay.  When did First Union first receive
17   notice that my client said that she didn't open any
18   accounts with your -- with your bank?
19        A      I'll have to look through the collection
20   notes.
21        Q      Mr. Durand, the first note I see in the
22   collection notes would be on page -- actually document
23   number 31.
24        A      Yeah.  Actually, that's the exact one that --
25   that I found.
```

Hedquist & Associates Reporters, Inc.

1   Q    Okay.

2        A    It seems to me that October 29th, 1999, there

3   was a communication where I spoke to Dorothy Bach.

4   Ms. Bach was asked if she wanted to do a fraud report,

5   she said she did not want to do anything on the account

6   until she looked at statements.  Ms. Bach was asked if

7   she wanted to prosecute her granddaughter for using the

8   card and Ms. Bach said, No.

9        Q    Where does it say she -- okay.  So she said

10  no?

11       A    Yeah.  And then it says here, She insisted on

12  receiving statements of the account before anything was

13  done.  It -- it appears to me that October 29th, 1999,

14  was the first communication we had with her regarding

15  that there was a problem.

16       Q    Okay.  Now, you -- you have had an opportunity

17  to see a letter that Ms. Bach claimed she sent on -- or

18  was faxed to First Union on October 22nd of 1999, have

19  you seen that document?

20       A    Yes, I did see that letter, sir.

21       Q    Okay.  And First Union has denied that it ever

22  received that document?

23       A    Correct.

24       Q    Okay.  Can you tell me how -- what prompted

25  the conversation on October 29th, 2001, that First

```
 1    Union never received that letter?

 2        A    I note by looking at the memo type, FRD PRV

 3    stands for fraud prevention --

 4        Q    All right.

 5        A    -- however, I do not know whether this was a

 6    call that was initiated by First Union or by Ms. Bach.

 7        Q    Okay.  But if -- assume for a second for

 8    purposes of my next question that Ms. Bach did not

 9    call First Union, what information did First Union have

10    to institute any kind of a fraud prevention

11    investigation?

12             MR. DEAL:  Object to the form of the

13         question.

14        Q    Okay.  My understanding is you still have to

15    answer the question to the best of your ability,

16    although your counsel's made an objection for the

17    record.

18             MR. DEAL:  Yes, go ahead and answer.

19        A    Yeah.  There -- there's previous notations,

20    sir, that are on the account that there were claims and

21    allegations of fraud.  So I believe that the fraud

22    department had already been aware and may have even

23    been working this account as a fraud account.

24        Q    Okay.  Could you take a look through all the

25    other documents I provided to you?  I'd like you to
```

Hedquist & Associates Reporters, Inc.

```
 1      find Ms. Bach's letter of October 22nd, 1999.

 2          A    Yes, I have it in front of me.

 3               MR. ECKERT:  Okay.  Could we go ahead and mark

 4          that as Exhibit 4?  I know we haven't gotten a 3

 5          yet, but --

 6               MR. DEAL:  Mike, I think -- didn't you give us

 7          two copies of that letter?

 8               MR. ECKERT:  I don't believe so.

 9               MR. DEAL:  Oh, wait a minute.  I have two

10          copies, one with handwriting on it at the bottom --

11               MR. ECKERT:  Okay.

12               MR. DEAL:  -- and one without.  And there are

13          two different telephone numbers at the top of the

14          two copies.  And these -- these are both -- and one

15          has things stapled to it, but these are both copies

16          that I got from you with your letter.

17               MR. ECKERT:  Okay.

18               MR. DEAL:  We need to specify which one you

19          want marked.

20               MR. ECKERT:  Sure.  The one I'm looking at is

21          -- it says, October 22nd, 1999, at the top.  It

22          says, First Union National Bank.  And then next to

23          it handwritten in is a phone number,

24          1-888-472-0535.

25               MR. DEAL:  Okay.  That's going to be Exhibit
```

```
 1        4?
 2              MR. ECKERT:   That's going to be Exhibit 4.
 3              MR. DEAL:   Okay.
 4              THE WITNESS:   Okay.   The previous two
 5        exhibits, did we call those A and B or 1 and 2?
 6              MR. ECKERT:   I'm sorry, they should be A and B
 7        and this would be D.
 8              THE WITNESS:   Okay.   I just wanted to make
 9        sure I wasn't going crazy because I had marked
10        those A and B.
11              (Plaintiff's Exhibit D was marked for
12     identification.)
13     BY MR. ECKERT:
14        Q     Do you have it in front of you?
15        A     I have the letter, yes.
16        Q     Okay.   Can you tell me if that 888-472-0535 is
17     a First Union fascimile number?
18        A     I do not know that that is.
19        Q     How would -- how would one go about
20     determining whether or not that's a number that First
21     Union uses?
22        A     I guess -- I guess you could try sending a fax
23     to it.
24        Q     Okay.   Well, is there any other way?   Is there
25     any kind of a directory?
```

```
 1        A    Perhaps.  I -- I can find out.

 2        Q    Okay.

 3        A    There may be.

 4        Q    If you could do that and provide that

 5   information to your attorney, that would be very

 6   helpful.

 7        A    Okay.

 8        Q    Have you -- have you ever contacted anyone in

 9   Charlotte, North Carolina, from First Union to find out

10   if they received a facsimile letter from Ms. Bach on

11   October 22nd, 1999?

12        A    I have not contacted anyone from Charlotte,

13   North Carolina.

14        Q    Okay.  At what point in time after the 29th of

15   October of 1999 could First Union have removed or

16   instructed the credit bureaus to remove the adverse

17   information regarding Ms. Bach?

18        A    By -- by looking at the collection history --

19        Q    Uh-huh.

20        A    -- I don't know that First Union would have

21   gone ahead and removed the derogatory information.

22        Q    Okay.  I didn't understand your answer to

23   that.  I guess my --

24        A    Okay.

25        Q    -- my question is:  At what point -- okay.
```

```
 1    You're saying that First Union could have done
 2    that?
 3         A    Well, what I'm saying is by looking at the
 4    collection file --
 5         Q    Uh-huh.
 6         A    -- there was not enough adequate reason for us
 7    to go ahead and take that action.
 8         Q    Okay.  But that's based on -- on First Union
 9    policy?
10         A    Yes.
11         Q    Okay.  Now, if we could go through -- let's
12    start with the collection notes on document number
13    21.
14         A    Okay.
15         Q    This is what appears to be a follow-up from
16    when Heidi Bake was arrested; is that your
17    understanding?
18         A    Yes.  I also wanted to make a clarification
19    that this is not a collection note.  It's a memo type,
20    FRD PRV, which, once again, is fraud prevention
21    department.
22         Q    Okay.  And we're looking at -- the date on
23    this thing is May 22nd, 1999?
24         A    That's what the -- that's what the printout
25    says, yes.
```

1   Q   Okay. Well, when it says added, is that the

2   date that it actually happens, that the event actually

3   happened or is that when it's entered into the

4   computer?

5   A   To the best of my knowledge, that would be the

6   date it was entered into the computer.

7   Q   Okay. By the way, it says -- what does FAL

8   mean?

9   A   This is just an assumption because FAL, I do

10  not -- it's not something that is definite, but I think

11  that it might stand for fraud alert.

12  Q   Okay.

13  A   And, again, that's just an assumption. We'd

14  have to find someone from fraud that could confirm

15  that.

16  Q   Okay. So if we operate under that assumption,

17  it says, Left fraud alert message for CH, what is CH?

18  A   Card holder.

19  Q   Card holder to call back. Please verify if

20  she is aware of this person and the use of the account

21  by her. May need to take a report. Can you tell me

22  what phone number was called and this message was left

23  at?

24  A   I cannot, sir.

25  Q   Okay. Can you tell me when the first date is

Hedquist & Associates Reporters, Inc.

1   that First Union had knowledge that Ms. Bach's phone

2   number was in the 937 area code?

3        A    I do believe I saw something in the notes.

4   Let me see if I can locate that for you.  It appears to

5   me by looking at the notes work history that on October

6   29th, 1999, we were advised that card holder's true

7   home number was 937-866-5600.

8        Q    Okay.  So is it -- is it fair to say that

9   First Union has -- has no evidence that the card that

10  was made on -- or the call that was made on May 22nd,

11  1999, was made to a 937 area code number?

12       A    Again, I -- I don't know what number was

13  called.

14       Q    Okay.  We have -- basically, we have Heidi

15  Bake being arrested and a card with Dorothy Bach's name

16  on it was in her possession, correct?

17       A    Correct.  That's what the notes indicate.

18       Q    Okay.  And then the police called First Union?

19       A    The assumption is that the police department

20  contacted us.  But, again, by looking at that

21  particular printout, there's no way for me to tell

22  whether it was an inbound or an outbound call.

23       Q    Okay.  Well, would First Union have had any

24  reason to call -- call the police department?

25       A    No.

Hedquist & Associates Reporters, Inc.

```
 1        Q     Now, the next page of document number 22 says,
 2    Customer verified that her granddaughter did have her
 3    card.  Stated that she did give her permission, removed
 4    BLK.CD is with police.  She will pick it up.  Now, I
 5    want to ask you what does BLK.CD mean?
 6        A     That stands for block code.
 7        Q     Okay.  Is that something First Union puts on
 8    to prevent anybody from using the account?
 9        A     There's various block codes.  And to be
10    honest, I'm not familiar exactly how they work, but it
11    was a way to designate an account as having a
12    particular status.
13        Q     Okay.  Anyway, it says --
14        A     You --
15        Q     Assuming that what this is saying is that the
16    card holder will pick it up, pick up the card at the
17    police department, do you see that?
18        A     Yes.
19        Q     Okay.  And that's how you interpret that?
20        A     Says, She will pick it up, you know.  I guess
21    you could make the assumption that it is the card.
22        Q     Okay.  And then the next document I want to
23    talk about is number 24.
24        A     Okay.
25        Q     It says that -- basically, it looks like
```

Hedquist & Associates Reporters, Inc.

1    Dorothy -- someone claiming to be Dorothy B. Bach

2    called First Union and requested a new card?

3        A    That's what it appears to be, yes.

4        Q    Okay.  And this is -- this is all entered

5    into your computer system on May 22nd of 1999, correct?

6    All these transactions we've been talking about, from

7    the time the person got arrested, you know, with

8    document 21, until the person called in with a new

9    card.

10       A    According -- according to the system, that's

11   the date that is showing.

12       Q    Okay.  So at least at this point in time,

13   First Union knew that there was a -- a potential

14   problem with the card, which is why they called the

15   person purported to be Dorothy Bach?

16       A    Correct.

17       Q    Okay.  And then they were told that whoever

18   the person said that they were, Dorothy Bach said that

19   they would come down to the police station and get the

20   card?

21       A    That can be assumed, yes.

22       Q    Okay.  And then on the exact same -- same day

23   that this is added into the computer system, First

24   Union is getting a request from someone purporting to

25   be Dorothy B. Bach for a brand new card?

```
1      A      There is a request for a card, yes.

2      Q      Did First Union take any -- any notice of the

3   fact that there was supposed to be a card picked up at

4   the police station and yet at the same time someone's

5   requesting a brand new card?  Is there any alerts that

6   went off at First Union that maybe here's a problem?

7      A      I don't know if there were alerts or not.

8   Again, this would have been a function of the fraud

9   department and I'm not aware of how they handle their

10  day-to-day business.

11     Q      Okay.  Well, you've done some investigation

12  since this case has been filed, I would assume?

13     A      I've really mostly reviewed -- reviewed the

14  content matter that's available in the case.

15     Q      Do you know if anyone ever went to the police

16  station and picked up that credit card?

17     A      I don't know that.

18     Q      Okay.  You never checked on that?

19     A      I personally did not, no.

20     Q      Okay.  Did this cause any -- any concern to

21  you, the fact that -- that the person purported to be

22  Dorothy Bach was supposed to go to the police station

23  and pick up a card, instead requested a new card?

24     A      Again, it's something that -- that's --

25  fraud's handling and it's not something that I'm
```

Hedquist & Associates Reporters, Inc.

```
1   related with, you know, on a day-to-day basis.  It's
2   something that I certainly would not have done.  At the
3   time that this occurred, it wasn't even in the recovery
4   department.
5        Q   Okay.  So -- so who, again, would I need to
6   talk to about -- about whether or not that was -- that
7   could have been a red flag?
8        A   Again, I think that if we could locate someone
9   that worked in fraud prevention, that would be the most
10  expert witness.
11       Q   Okay.  Do you know who the operator with the
12  initials CV is?
13       A   I do not have that -- I do not have that
14  listed here on the exhibit that you're showing me.
15       Q   Okay.  If it's on the other exhibit you gave
16  me, that's fine.  It says also on document 25 that the
17  person was requesting 15 standard reorder access
18  checks?
19       A   Correct.
20       Q   Okay.  And this also was placed in the -- in
21  your computer system on May 22nd of 1999?
22       A   Correct.
23       Q   And it says, Reason for request is bank error,
24  you see where it says that?
25       A   Yes, I do see that entry there.
```

Hedquist & Associates Reporters, Inc.

1        Q   Okay. Is that something that the bank enters

2 or is it something that the customer informs the bank

3 of?

4        A   I -- to be honest, I don't know what that

5 means. The reason for request, bank error, that's

6 something that, I think, was entered by the

7 representative that handled this call, but I have no

8 knowledge as to what it could mean.

9        Q   Do you have any evidence or does First Union

10 have any evidence that you know of that Dorothy Bach

11 ever opened up any account with First Union?

12        A   I -- we do not have an application on Dorothy

13 Bach.

14        Q   Okay. Do you have any -- any phone records

15 from any calls to her in the 937 area code that would

16 indicate that -- that she opened an account with First

17 Union or used an account with First Union?

18        A   Again, as far as calls being placed from the

19 bank, I cannot determine the numbers that these calls

20 were made to.

21        Q   Okay. At the time after First Union contact

22 -- had a contact with Ms. -- Ms. Bach on October 29th

23 of 1999, did she at any point in time tell you or First

24 Union that she did, in fact, open an account with First

25 Union?

Hedquist & Associates Reporters, Inc.

```
 1        A    No, she did not.

 2        Q    And, in fact, her position has always been

 3   that she did not open any accounts with First Union;

 4   isn't that correct?

 5        A    Correct.

 6        Q    Will you take a look at document number 28?

 7        A    Yes.

 8        Q    Okay.  Can you tell me what that flag DDA

 9   10/14/99 means?

10        A    I do not know what that means.

11        Q    Okay.  And who would I talk to to find out

12   what that means?

13        A    That would have been a note that was entered

14   by someone in collections Miami.

15        Q    Okay.

16        A    It would have to be someone that worked in

17   that department.

18        Q    Do you know the names of any of the people

19   that worked down there?

20        A    That department is no longer in existence,

21   sir.  It shut down operations.

22        Q    All right.  What about document number 29?

23   And it says 10/14/99 and then 2841, do you know what

24   that means?

25        A    No, I do not.
```

```
 1        Q     What about document 30, the entry that's on
 2    that?
 3        A     Yes, I see the entry and I do not know what
 4    that means.
 5        Q     Does that have anything to do with -- with
 6    possibly Ms. Bach's letter of October 22nd?
 7              MR. ECKERT:  Objection, asked and answered.
 8        A     I don't think it has anything to do with the
 9    letter.  If anything, if I had to make an assumption,
10    it has to do with the credit line, 24,500.  And, again,
11    I'm -- I'm assuming that that's what that entry is
12    about.
13        Q     Okay.  Do you have any -- any documentation
14    supporting what you said earlier about the fraud
15    department was still working on this -- this account on
16    10/29 of '99?
17        A     The only documentation that I have is the --
18    the system notations that clearly indicated that the
19    memo typed was from FRD PRV, which is the fraud
20    prevention department.
21        Q     Okay.  And that's the one -- we're talking
22    about document number 31?
23        A     Correct.
24        Q     Now, do you have -- does First Union have some
25    sort of an agreement with their card holders that the
```

Hedquist & Associates Reporters, Inc.

1   card holders will cooperate with First Union in

2   prosecuting fraud?

3       A    I'm not aware if that's in the card holder

4   agreement or not.

5       Q    Okay.  Was it ever represented to Ms. --

6   Ms. Bach that that was, in fact, a requirement of the

7   card holder?

8       A    I have no knowledge of that.

9       Q    Now, during the course of dealing with

10  Ms. Bach's allegations that the accounts were not hers,

11  was she treated as a card holder or was she treated as

12  someone who never opened an account with First Union?

13      A    I'm not really -- I'm not really sure how she

14  would have been perceived from the fraud prevention or

15  the collections area.

16      Q    Okay.  Is there -- is there any documentation

17  that -- that would tell us either way which way she was

18  -- which way she was treated?

19      A    Other than just the collection notes, you

20  know, obviously, there's indications there that she

21  refused to prosecute the granddaughter.  And as a

22  result of not prosecuting the granddaughter, the

23  collection activity continued on the account.

24      Q    Okay.  What -- what money did the

25  granddaughter take from -- from Ms. Bach?

Hedquist & Associates Reporters, Inc.

1    A    What do you mean "what money"?

2    Q    Well, I guess my question is -- well, let me

3    start with this. Why didn't First Union prosecute the

4    granddaughter?

5    A    I believe that in order to prosecute the

6    granddaughter and have a better case, First Union would

7    have needed at least, at a minimum, a fraud affidavit

8    from Ms. Bach. And then at that point in time, First

9    Union would have been relieved and know there was no

10   collusion. And at that point in time, then I'm

11   assuming the fraud department would have done whatever

12   they would normally do in the sense of evaluating

13   whether they would pursue Heidi Bake.

14   Q    Okay. And -- and I guess my question -- the

15   last part of your answer, I think, dealt with whether

16   or not the bank would go after her civilly; is that --

17   is that true?

18   A    Are you referring to Heidi Bake?

19   Q    Yes.

20   A    I believe that the fraud department would

21   actually pursue these accounts criminally.

22   Q    Okay.

23   A    Yeah.

24   Q    And what -- you have a notification from

25   Ms. Bach on 10/29 that the accounts weren't hers,

1    correct?

2         A    She did state that -- yeah, she did state that

3    -- that they were -- that the accounts were not hers,

4    yes.

5         Q    And throughout the next couple of months, she

6    had reported that these accounts were -- were not hers

7    also to your corrections department?

8         A    Correct.

9         Q    And in February of that same -- of 2000, you

10   received a letter from my office unequivocally stating

11   that these accounts were not Ms. Bach's and that she

12   did not use them?

13        A    Correct.

14        Q    Was First Union's position that that was not

15   enough evidence to be able to submit that to a -- to a

16   criminal prosecutor?

17        A    I believe it's First Union's position that in

18   order for us to even evaluate an account as it being

19   fraud, the first requirement is that the card holder

20   must complete a fraud affidavit and must be willing and

21   prepared to assist us in prosecuting the perpetrator of

22   the fraud.  And to the best of my knowledge, and

23   according to the collection records, Ms. Bach was not

24   -- was not cooperative in those respects.

25        Q    And -- and you said that -- that the card

```
1    holder was required to fill out this affidavit,

2    correct?

3         A    Correct.

4         Q    Okay.  Was Ms. Bach ever a card holder at

5    First Union?

6         A    The account was set up as her being a card

7    holder because the information that was used to open

8    the account was her information.

9         Q    First Union pulled a credit report on Ms. Bach

10   when the credit card was opened, correct?

11        A    I'm assuming they would.  Again, that's a

12   different department.  That would have been the front

13   end origination.  And I have no record as to whether

14   that was done or not, but the assumption is, yes.

15        Q    Okay.  Well, because First Union issued a

16   credit card for about, what, a limit of $24,500?

17        A    Correct.

18        Q    So you would assume that the credit report was

19   pulled?

20        A    Yes.

21        Q    At what point in time did First Union conclude

22   that Ms. Bach did not open the credit card account?

23        A    Well, again, I think that First Union was

24   alerted that there was a potential situation back on

25   May 22nd of '99 when we were contacted by the Ormond
```

Hedquist & Associates Reporters, Inc.

```
1    Beach Police Department.  And then, again, October
2    29th, '99, when we spoke to Ms. Bach and she -- and she
3    stated that, you know, that it wasn't her account.  But
4    at that time we had asked her if she wanted to do a
5    fraud report and she said that she didn't want to do
6    anything on the account until she got the statements.
7    At that time she was asked if she wanted to prosecute
8    her granddaughter for using the card and she flatly
9    said, no.
10       Q    Okay.  And does -- does Ms. Bach have any
11   contractual relationship that you know of with First
12   Union?
13       A    No.  Only to the extent that her information
14   was used to secure the credit card.
15       Q    Okay.  But you haven't -- you have no
16   information to prove that she was the one that -- that
17   opened the account or authorized someone to open the
18   account?
19       A    Correct.
20       Q    Okay.  So -- and that's been true since, at
21   the very latest, 10/29 of 1999?
22       A    That is the point in time that we were advised
23   that she believed that there was fraud in the account.
24       Q    Now, does that trigger some sort of an
25   investigation at First Union?
```

Hedquist & Associates Reporters, Inc.

1      A      Well, we -- we know that the account was

2   worked by the fraud department.

3      Q      Uh-huh.

4      A      To what extent, what work was there and what

5   investigations were made, I -- I have no knowledge.

6   Again, that would have to be someone in the fraud

7   prevention that would be able to speak as to what goes

8   into their fraud investigation.

9      Q      Okay. So anything dealing with fraud

10  investigation, you don't have any knowledge on that you

11  can share with us?

12     A      Correct, sir.

13     Q      Okay. Can you tell me why First Union

14  continued to report this information about Ms. Bach

15  after 10/29 of '99 when there was a dispute as far as

16  who opened the account?

17     A      The reason why it would have continued

18  reporting, again, would have been because of Ms. Bach's

19  lack of cooperation in resolving this matter once and

20  for all by, you know, providing information, executing

21  an affidavit of fraud. It just simply -- the things

22  that needed to be in place for us to go ahead and

23  remove her from the account were not done. And since

24  they were not done, I believe there's even a notation

25  in the collection history that clearly indicates that

Hedquist & Associates Reporters, Inc.

1   at one point in time that fraud said that they were no

2   longer handling the account. And the way that it would

3   work is that if fraud made a determination that an

4   account was not true fraud because of a domestic case,

5   then that account would be kicked back to collections

6   and it would continue in the collection cycle.

7        Q    Okay.  So is it fair to say that on October

8   29th when Ms. Bach informed First Union that -- that

9   she did not open the account, nor did she authorize

10  someone to open the account in her name, nor did

11  she use the account that First Union did not believe

12  her?

13       A    I don't think that we didn't believe her, but

14  I think that her reluctance to prosecute the

15  granddaughter and her reluctance to fulfill the

16  necessary requirements that were needed to conclude the

17  matter as a fraud case prevented us from handling it as

18  a fraud case.

19       Q    Well, whoever was posing as Ms. Bach stole

20  money from First Union, would you agree with that?

21            MR. DEAL:  Objection to the form of the

22       question.

23       A    I don't know that it would be stealing, but

24  certainly it was a manipulation through fraud.  And we

25  certainly did suffer a loss because of that fraudulent

Hedquist & Associates Reporters, Inc.

1   activity.

2        Q    Okay.  Now, there were numerous calls made to

3   Ms. Bach during, I guess it would be November and

4   December of 1999 and January of 2000, would you agree?

5        A    Yes, there were -- there were several

6   collection calls.

7        Q    Now, on the document that you've given to me,

8   is there anything that indicates the time of day in

9   which the -- the telephone call was made?

10       A    Yes, sir.  If you take a look at the field,

11  the third field under added in the center of the

12  page --

13       Q    Right.

14       A    -- that time would be the time that the call

15  was placed.

16       Q    Okay.  Well, I thought -- I thought what you

17  told me earlier, that's what time the -- that that was

18  entered into the computer, not necessarily what time

19  something occurred?

20       A    Yes, that is the time that it's entered into

21  the computer.

22       Q    Okay.  So it's not necessarily the time of the

23  call?

24       A    Not necessarily.  But from the collections

25  end, to the best of my recollection, most of these

1   calls would have been done on a power dialer. And in

2   order to move on to the next account in a power dialer

3   you'd have to enter a notation, so I'm pretty confident

4   that -- that those times would be very, very close to

5   the time that the actual call took place.

6        Q    Okay. Could we look at document 42?

7        A    Yes, I see it.

8        Q    Okay. It says -- it looks like there's a

9   conversation that occurred?

10       A    Yes.

11       Q    Okay. And under the added field for time,

12  it's -- it looks like, what, 8:00?

13       A    Yes, that would be, I believe, 8:10; is that

14  correct?

15       Q    Then last used is the exact same time, do you

16  see that?

17       A    No. No. Where are you -- where are you

18  seeing that?

19       Q    The field that says last used.

20       A    Okay. Yes.

21       Q    That's the exact same time?

22       A    Yes.

23       Q    Okay. So this added and last used has nothing

24  to do with the duration of the call?

25       A    I -- I do not know. I do not know what that

Hedquist & Associates Reporters, Inc.

```
 1    last used exactly means.

 2         Q    If you could go to document 55, please.

 3         A    Okay.

 4         Q    This is dated January 20th of 2000?

 5         A    Yes.

 6         Q    Okay.  It says, CBI shows different address.

 7    1602 Thunderbird Lane, Dayton, Ohio 45449.  It has a --

 8    it has a 937 prefix there.  What does CBI mean?

 9         A    I believe that that would have been credit

10    bureau investigation.

11         Q    Okay.  So this is First Union's pulling a

12    credit report on Ms. Bach?

13         A    Yes.  The assumption is that someone in

14    collections Miami had pulled a credit report in efforts

15    to skip trace or normal course of collection activity

16    and obtained this information.

17         Q    What authorization did Ms. Bach ever give

18    First Union to pull her credit report?

19         A    I'm not sure if that's included in the card

20    member agreement or not.  It may be.

21         Q    Okay.  But if she never signed the card holder

22    agreement, what other authorization did Ms. Bach -- or

23    what authorization did Ms. Bach ever give to First

24    Union to pull her credit report?

25         A    Ms. Bach would not have given us
```

1    authorization. However, we would have pulled this in

2    the course of our normal business duty.

3         Q    Okay. And, in fact, you pulled this credit

4    report after she advised First Union that the account

5    was not hers; isn't that true?

6         A    It was pulled after she advised us that --

7    that she felt there was fraud on the account.

8         Q    Well, after she advised you -- First Union

9    that she never opened the account?

10        A    Correct.

11        Q    Okay. And if we go to document 57.

12        A    Uh-huh.

13        Q    It says, Possible fraud account. What -- what

14   is the purpose of -- of making that notation?

15        A    That's just a notation that would have been

16   entered there by a collector.

17        Q    Okay. And so at that point in time it would

18   have been First Union's position that this was a

19   possible fraud account?

20        A    I believe that it's been the position of First

21   Union going back to 5/99 that there was a possible

22   fraud on the account. I mean, obviously, there's notes

23   previous to this -- that indicate that fraud prevention

24   has been involved and that, you know, there was a call

25   from the Ormond Police Department. I don't think this

```
 1    was the first realization of such.

 2         Q    Okay.  But at least January 20th of 2000,

 3    First Union, basically, what you just said, they had

 4    the belief that this was a possible fraud account?

 5         A    Correct.

 6         Q    And First Union is still knowingly reporting

 7    information about Ms. Bach to the credit bureaus in

 8    January of 2000?

 9         A    Correct.

10         Q    And that -- that information that First Union

11    is reporting to the credit bureaus is adverse

12    information?

13         A    It would have been delinquency information as

14    the account progressed in delinquency, yes.

15         Q    Okay.  Does delinquent information ever help

16    somebody's credit score?

17         A    No.

18         Q    And can you tell me, what is your

19    understanding of what is the purpose of the credit

20    bureaus?  What -- what's their purpose?

21         A    What is their purpose?

22         Q    Uh-huh.

23              MR. DEAL:  Objection to the form of the

24         question.

25         A    They compile information on consumers relative
```

Hedquist & Associates Reporters, Inc.

```
 1    to their payment history and financial history.
 2         Q    And -- and you agree with me the primary
 3    purpose of -- of a credit bureau is to allow lenders to
 4    access information so that they can make informed
 5    decisions on whether or not to grant somebody credit?
 6         A    Correct.
 7         Q    Okay.  And it is not the purpose of -- of the
 8    credit bureaus to assist in creditors collecting
 9    money?
10         A    Correct.
11         Q    But isn't that how First Union used Ms. Bach's
12    credit report in this case?
13         A    What do you mean?
14         Q    Well, you're reporting information about
15    Ms. Bach that she owes First Union 24-, 25-, $26,000,
16    you agree with that?
17         A    Yes.
18         Q    Okay.  And then we have your internal
19    documents which say this is a possible fraud account,
20    she may or she may not owe us this money, do you agree
21    with that?
22         A    That is correct.  But, again, her reluctance
23    to cooperate and do the things that were necessary to
24    remove her from the account and -- and have this be
25    considered as a fraud account and the balance waived
```

Hedquist & Associates Reporters, Inc.

```
 1    were not done.  It was her lack of cooperation that --

 2    that made it where the collection activity on this

 3    continued.

 4        Q    Okay.  Do you have any agreement with Ms. Bach

 5    that requires her cooperation with First Union?

 6        A    No.

 7        Q    Now, if you could take a look at document

 8    number 60, do you recognize that?

 9            MR. DEAL:  6-0?

10            MR. ECKERT:  6-0, yes.

11        A    It's a memo type entered by collections in

12    Miami.

13        Q    Okay.  Do you know what Emerald is?

14        A    Emerald is the -- Emerald is the system that's

15    used that houses all information on the relationship of

16    a particular individual.  It would have, you know,

17    snapshot information, on, let's say, checking accounts,

18    saving accounts, CDs.  Whatever relationships an

19    individual has with the bank would show on Emerald

20    under that person's name.

21        Q    Okay.  And I -- I haven't received any

22    information, I don't think, on the Emerald system.  Is

23    that something you've looked at to see if there's any

24    information regarding Ms. Bach on the Emerald system?

25        A    I believe there was information on her.
```

```
 1          Q     Okay.

 2          A     It's just, you know, her name, address and

 3    relationships that she had with the bank.

 4          Q     Okay.  And, I mean, were those documents

 5    produced that you know of?

 6          A     I don't know.  I'm not sure.

 7          Q     Okay.  And is Emerald a First Union system?

 8          A     Yes.

 9                MR. ECKERT:  Okay.  Just for the record, I'd

10          ask that any documents that pertain to my client

11          that First Union has, I'd insist they be produced,

12          John.

13                MR. DEAL:  We'll go back and check.

14                MR. ECKERT:  Thanks.

15                MR. DEAL:  Sure.

16    BY MR. ECKERT:

17          Q     If we could look at document number 63.

18          A     Okay.

19          Q     It says in the fourth line of the notation --

20    let's see, third line of the notation, I advised that

21    if granddaughter did indeed make charges without her

22    knowledge, if she don't press charges against her,

23    we'll submit this account for legal.  Do you see where

24    it says that?

25          A     Yes, I do.
```

```
 1        Q    Okay.  Could you tell me what -- upon what
 2    basis that -- that threat can be made?
 3             MR. DEAL:  Objection to the form of the
 4        question.
 5        A    Well, again, that goes to policy at First
 6    Union.  If -- if an individual is not going to
 7    cooperate and press charges against a perpetrator of
 8    fraud, if they're not willing to execute a fraud
 9    affidavit, then we would continue collection activity
10    on that individual.
11        Q    Okay.  Regardless of whether or not you have
12    proved that that individual had any kind of a
13    contractual relationship with First Union, correct?
14        A    Collection activity would continue, yes.
15        Q    Okay.  When it says, We'll submit this account
16    for legal, what's that mean?
17        A    That means that the account will be submitted
18    for legal review.
19        Q    Okay.  And that's to decide whether or not
20    some sort of action is going to be filed against
21    Ms. Bach?
22        A    Correct.
23        Q    Okay.  And why does First Union decide not to
24    sue Ms. Bach?
25             MR. DEAL:  Objection.
```

1        A     The reason why Ms. Bach would not have been

2    sued is the account in and of itself would not have

3    been deemed to be a suitworthy account.

4        Q    And why is that?

5        A·   Because of her age, because of the dispute,

6    you know, in question.  First Union did not do a lot of

7    precharge-off litigation.  It was very, very minimal.

8    And the precharge-off litigation that we would engage

9    in would be on the files that we thought were the most

10   collectible and the most suitworthy.  This simply would

11   not have been one of the top -- top cases as far as

12   recovery post judgment, for instance.

13       Q    Okay.  And also it wouldn't have been a real

14   strong -- I mean, you guys didn't think that you could

15   win against Ms. Bach, did you?

16       A    Again, I mean, why -- why consider that when

17   there's other accounts out there that are more

18   suitworthy.

19       Q    Okay.  But I guess what I'm trying to

20   understand is you have some accounts that you feel that

21   you have good evidence and then, therefore, you may

22   file suit on the cases where you feel like you have

23   good evidence, correct?

24       A    It's not just evidence, sir.  It's also the

25   ability to recover, you know, post judgment, you know.

1   The financial ability of the individual.  I believe

2   that, you know, that we did know that Ms. Bach was 75

3   years old, you know.  There would have been, you know,

4   some information probably that would have been looked

5   at regarding, you know, her finances.  And, you know,

6   it's not just -- it's not just evidence, it's also the

7   ability to pay as a result of litigation.

8       Q    Okay.  So at some point in time, I would

9   assume First Union decided that -- that they weren't

10  going to sue Ms. Bach?

11      A    Correct.

12      Q    And at that same point in time, they decided

13  they were going to keep on reporting adverse credit

14  information about her?

15      A    The information continued to be reported,

16  yes.

17      Q    If you could look at document number 69.

18      A    Okay.

19      Q    We're at January 31st of 2000.

20      A    Yes.

21      Q    Okay.  And the notation says, Spoke with Ruben

22  in fraud department, said that this is no longer being

23  handled by fraud department.  Said as of 5/99, this was

24  turned over to the Ormond Beach Police Department as a

25  domestic case.

Hedquist & Associates Reporters, Inc.

```
1          A    Correct.

2          Q    Do you see that?  So is it fair to assume from

3     this notation that from 5/99 to January 31st of 2000,

4     First Union's fraud department did not conduct any

5     investigation into this account?

6          A    I -- I don't know if there -- if they would

7     have conducted an investigation after the date.  What

8     it looks like to me that this means is that since it

9     was a domestic case, it was in the hands of the Ormond

10    Beach Police Department, the fraud department was not

11    actively pursuing it and handling it as a fraud matter.

12         Q    Okay.  And would not this notation go against

13    your earlier assumption that fraud was monitoring this

14    in October of '99?

15         A    Well, there was -- in October of '99 there was

16    a notation in the system by the fraud prevention

17    department.  Whether -- I mean, you know, what they

18    were doing at the time of the account, I don't know.

19    But it's obvious from the computer record that a call

20    did take place in October '99, you know, whether it was

21    outbound or inbound, and it was handled by the fraud

22    department.

23         Q    Okay.  Do you know who Mike Fernandez is?

24         A    Mike Fernandez, yes.

25         Q    Who is he?
```

Hedquist & Associates Reporters, Inc.

```
 1        A    He used to work in the recovery department in
 2   Miami.
 3        Q    Okay.  And he -- he was an attorney?
 4        A    No, he was not.
 5        Q    Okay.  Document number 7-0?
 6        A    Uh-huh.
 7        Q    There's a notation that someone spoke with
 8   Mike Fernandez of the legal department, said it's
 9   possible this was rejected, even though he don't see it
10   on his list, said CS's of age and if she's not going to
11   press charges against her granddaughter, there's not
12   much she can do.
13             Where it says, There's not much she can do, do
14   you know who that "she" is referring to?
15        A    I do not.
16        Q    Okay.
17             MR. DEAL:  Where -- what do you have reference
18        to?
19             MR. ECKERT:  Document number 7-0.
20             MR. DEAL:  Okay.
21   BY MR. ECKERT:
22        Q    Can you -- call you tell me what this notation
23   means?
24        A    It looks to me like collections Miami
25   contacted Mike Fernandez to see if this account had
```

```
1    been approved for litigation or not.

2        Q    Okay.

3        A    And what -- what Mike Fernandez is saying is

4    that it's possible that it was rejected, even though he

5    didn't see it on his list.  I'm assuming that he had a

6    list that he kept of rejected files.

7        Q    Okay.  And you don't know who "there's not

8    much she can do" is referring to?

9        A    No, I -- I don't.

10       Q    And then document 72, it says, Receive

11   litigation referral, do you see that?

12       A    Yes.

13       Q    It says, Request is turned down?

14       A    Correct.

15       Q    Now, is the litigation referral, is that a

16   department within First Union?

17       A    No.  Litigation referral would have actually

18   been a file that would have been sent from collections

19   to recovery for review.  What this means is that they

20   received a litigation referral, would have been a

21   package, the request was turned down.  The reason why

22   it was turned down was the debtor has no assets.  She's

23   a 75-year-old lady on Social Security.  Supposedly her

24   granddaughter has been using the card.  Mrs. won't

25   press charges and we can't sue granddaughter.
```

Hedquist & Associates Reporters, Inc.

```
1          Again, like I was saying earlier, not the
2    ideal prime choice case that you would want to go ahead
3    and file litigation on.
4        Q    What was -- what was the purpose in continuing
5    to report information about Ms. Bach after February 2nd
6    of 2000?
7        A    The reason why information continued to report
8    was because it was being considered as a collection
9    matter.  Fraud was no longer handling the account.  And
10   it's clear that the requirements that were necessary
11   from Ms. Bach in order for this matter to be concluded
12   as fraud, she did not, you know -- she did not do those
13   things, those requirements and because of that, it
14   continued as a collection matter.
15       Q    Okay.  But what was -- what was First Union's
16   goal in continuing to report the information about
17   Ms. Bach to the credit bureaus?
18       A    No particular goal.  First Union, you know,
19   reports information on all -- on all the accounts in
20   the collection department.  As long as it's in
21   collections and it's not a resolved matter, it's going
22   to continue reporting.
23       Q    Isn't it one of the requirements that the
24   information First Union report to the credit bureaus be
25   accurate?
```

Hedquist & Associates Reporters, Inc.

```
 1        A    Yes.
 2        Q    Is there anything that First Union has
 3   reported to the credit bureaus about Ms. Bach that has
 4   been accurate?
 5             MR. DEAL:  That has been accurate?
 6             MR. ECKERT:  Yes.
 7        A    As far as what we perceived the account to be,
 8   we thought we were reporting accurate information.  And
 9   that is that, you know, she was on the account, the
10   account was opened up with her information.  And,
11   again, her reluctance to do the things that would
12   have -- you know, that would have closed this account
13   out, that would have resulted as a fraud account were
14   not done, so it continued as a collection matter and
15   that's why it was reported.
16        Q    So -- so it's First Union's position that
17   everything that they reported to the credit bureaus
18   about Ms. Bach was accurate?
19        A    In the sense that it was still a collection
20   matter, yes.
21        Q    Well -- and is there any sense -- is there any
22   information that First Union reported to the credit
23   bureaus that First Union believes is inaccurate?
24             MR. DEAL:  Inaccurate?
25             MR. ECKERT:  Inaccurate.
```

Hedquist & Associates Reporters, Inc.

```
1              MR. DEAL:  Not accurate?

2              MR. ECKERT:  Not accurate.

3         A    No.

4         Q    Okay.  Can you tell me, then, why First Union

5    has chosen to remove or request the credit bureaus to

6    remove the information about Ms. Bach?

7         A    I think that when Ms. Bach in her testimony

8    under oath went ahead and made the assertions that this

9    was fraud, that that was reason at that point in time

10   for us to go ahead and take such -- such action to

11   remove it.  I think all along what we've been looking

12   for is some kind of -- some kind of oath of -- you

13   know, from her, whether it was in the form of a fraud

14   affidavit, you know, that would be more than just her

15   word, you know.  I just -- I believe that her testimony

16   under oath that -- that this was a fraud matter was

17   sufficient for us to take that action.

18        Q    Okay.  She filed a complaint in this case?

19        A    Correct.

20        Q    And you received that?

21        A    I -- I think I've seen the complaint before,

22   yes.

23        Q    Okay.  And did that -- and that wasn't enough

24   to do it for you guys to remove the information?

25        A    No.  At the time, no.
```

Hedquist & Associates Reporters, Inc.

1    Q    Okay.  So it's fair to say that the only

2  reason First Union -- strike that.

3         It's fair to say that First Union would only

4  remove this information about Ms. Bach if she filed

5  suit against them?

6    A    That's not true.

7    Q    Okay.  Well, would it be fair to say that

8  because Ms. Bach filed suit against First Union --

9  well, strike that.

10        After Ms. Bach filed suit against First Union,

11  at some point in time First Union decided that Ms. Bach

12  did not have the account that you had been reporting to

13  the credit bureaus?

14    A    Yes.  I think more so importantly after her --

15  her testimony under oath that she did not apply for

16  that account.

17    Q    Can you look at document number 73?

18    A    Yes.

19    Q    Okay.  Can you tell me, did Ms. Bach ever give

20  anyone from First Union permission to speak to any of

21  her relatives?

22    A    I don't know if she did or not.

23    Q    Okay.  Well, it appears from this notation

24  that someone from First Union called Ms. Bach's home?

25    A    Yes.

1      Q      Okay.  And someone who said that she was

2   Heidi's sister was told about fraud by a granddaughter

3   using a card without the customer's permission, do you

4   see that?

5      A      Yes, I see that notation.

6      Q      Did Ms. Bach ever give anyone from First Union

7   permission to discuss this situation with anyone else

8   in her family?

9      A      Again, I do not know if she did or she did

10  not.  I have no record that she gave us permission.

11     Q      If you could take a look at the document

12  number 75.

13     A      Okay.

14     Q      Do you recognize that document?

15     A      I -- I do not.

16     Q      Do you know what the notation means in there?

17     A      I do not.

18     Q      And what I'm talking about is the one that

19  starts 4AUTO.

20     A      Yeah, I'm not familiar with that and I don't

21  even know what the memo type 197 is.

22     Q      Okay.  Who would we talk to about that?

23     A      This is a good one.  I -- I really don't know.

24  It looks like it might be a system -- I -- I guess

25  someone that would be very familiar with the FDR

```
 1    system.

 2         Q    And the letter you received from my office,

 3    that was dated February 8th, correct?

 4         A    The date on your letter was February 8th,

 5    correct.

 6         Q    Okay.  And that was faxed to First Union?

 7         A    From what I can tell by your cover letter,

 8    yes.

 9         Q    Do you have any reason to dispute that it was

10    not faxed to First Union on that day?

11         A    No.

12         Q    If you could look at document number 76.

13         A    Uh-huh.

14         Q    Okay.  Can you tell me what that notation

15    means?

16         A    Looks like it was a call placed by collections

17    Miami.

18         Q    Uh-huh.

19         A    Lady said can't give you any information, hung

20    up.

21         Q    Okay.  So this is an attempt by -- by First

22    Union to contact Ms. Bach after receiving my letter of

23    February 8th?

24         A    It seems like that is the case, correct.

25         Q    And that would violate First Union's policy,
```

1    wouldn't it?

2        A    I don't know that it's our policy that we

3    can't necessarily communicate with -- with individuals

4    after -- after being represented by an attorney.  I

5    mean, I know that First Union follows the spirit of the

6    FDCPA, but I don't know that it's anywhere in writing,

7    maybe it is, that it specifically prohibits us as far

8    as First Union policies are concerned.

9        Q    Well, we'll get to that.

10       A    Okay.

11       Q    And then 2/11 of 2000, I'm looking at document

12   number 77.

13       A    Yes.

14       Q    Okay.  It says, Attorney wants card holder

15   name removed from account, previous fraud notes say, A,

16   will not prosecute third party for fraud.  So who is

17   the third party?

18       A    Okay.  Interesting enough, just -- just for

19   clarification, on this date it's actually received

20   letter from attorney.

21       Q    Okay.  I see what you're saying.

22       A    Yeah, received letter from attorney.  And

23   it -- it could very well be that on -- it could very

24   well be that on the February 10th date, the collections

25   area had as of yet not gotten your fax.

Hedquist & Associates Reporters, Inc.

```
 1        Q     Okay.

 2        A     I'm not sure where you faxed it to, but if you

 3   would have faxed it, for instance, to -- you know, to

 4   customer service or another area of the bank, it may

 5   have taken it a couple days to get to collections.  But

 6   just as clarification, on February 11th, this says

 7   received letter from attorney, wants card holder

 8   removed from account.  Previous fraud notes say -- say,

 9   A, and I believe that A stands for the primary, the

10   primary card holder --

11        Q     Uh-huh.

12        A     -- will not prosecute third party for fraud.

13   The assumption would be the third party is Heidi Bake,

14   but, again, that's just an assumption.

15        Q     Okay.

16        A     Will forward letter to Miami and send copy to

17   filming.  Interesting enough, it seems like the letter

18   originally went to collections in Wilkesboro that's

19   what C-O-L-W-L-K stands for, collection Wilkesboro.

20   And it seems that they were going to forward the letter

21   to Miami.  The reason why was because the account was

22   being, I believe, worked in collections Miami.

23        Q     Okay.  Can you look at -- do you have the

24   letter from my office dated February 8th, 2000, there?

25        A     Yes, I have it.
```

```
 1        Q    Okay.  Can you mark that as Exhibit 5?

 2        A    Okay.

 3             (Plaintiff's Exhibit E was marked for

 4   identification.)

 5             MR. DEAL:  Hold on just a second, I'm trying

 6        to locate that.

 7             MR. ECKERT:  Sure.

 8             MR. DEAL:  Okay.  This is a two-page letter?

 9             MR. ECKERT:  Three-page.

10             MR. DEAL:  Three-page.  So the fax cover sheet

11        is on the third page?

12             MR. ECKERT:  Correct.

13             MR. DEAL:  And that's -- is that E, Exhibit E,

14        right?

15             MR. ECKERT:  Oh, I'm sorry, you're right.

16   BY MR. ECKERT:

17        Q    Do you have that?

18        A    I have it.

19        Q    Okay.  It says it was faxed to Christy in

20   Brunswick, Georgia.

21        A    Okay.

22        Q    And do you know what department that is?

23        A    Actually, this Brunswick, Georgia, that P. O.

24   Box --

25        Q    Uh-huh.
```

Hedquist & Associates Reporters, Inc.

```
 1        A    -- is not even a department.  That was just a

 2   P. O. Box that was used for credit card payments and

 3   mail, but there was no actual presence or building in

 4   Brunswick, Georgia, to the best of my knowledge.

 5        Q    What about the facsimile number 336-651-5227,

 6   do you know where that goes?

 7        A    I do not.  But I -- I will say this, the

 8   fascimile did not go directly to the Miami collections

 9   department --

10        Q    Uh-huh.

11        A    -- because in Miami -- obviously, Miami is a

12   305 area code.  So it would not have gone directly to

13   the department that was engaged in the collection

14   activity.

15        Q    Okay.  In the second paragraph of this letter,

16   about halfway through the second paragraph, there's a

17   request that First Union provide legible copies of all

18   transaction signatures.

19        A    Yes, I see it.

20        Q    Has First Union ever made any effort to -- to

21   look at the transaction signatures?

22        A    Are you talking about sales drafts?

23        Q    Yes.

24        A    I believe that -- I believe that attempts have

25   been made to request it.  I, myself, have not, but I do
```

```
1    believe that -- that that may have happened.

2         Q    Okay.  Do you know if any of those were ever

3    obtained?

4         A    I have not seen sales drafts.  I've only seen

5    statements on the account.

6         Q    Okay.  Has anybody told you that they have

7    looked at the signatures on sales drafts?

8         A    No.

9         Q    Okay.  And do you know who it was that was

10   possibly looking into that?

11        A    This was originally handled by Teresa Mahallic

12   in Miami.  She's no longer with the bank.

13        Q    Uh-huh.

14        A    And more recently, Monica Pendleton has been

15   handling this account.

16        Q    Okay.

17        A    I'm assuming that if such a request would have

18   been placed, that it would have been from either of

19   those individuals.

20        Q    Okay.  And is that something that could have

21   been done back in November and December of 1999, in

22   that the bank could have requested copies of the sales

23   drafts?

24        A    If it would have been requested, it could have

25   been, yes --
```

Hedquist & Associates Reporters, Inc.

```
1        Q    Okay.

2        A    -- back in that time.

3        Q    And you have -- you have no information to

4    suggest that was done?

5        A    Correct.

6        Q    Okay.  Do you have any documents, sales drafts

7    or account applications that First Union contends were

8    signed by Ms. Bach?

9        A    I do not have any such documents in my

10   possession, no.

11       Q    Okay.  Have you ever seen any such documents?

12       A    No.

13       Q    Still there?

14       A    Yes, I am.

15       Q    Did you hear my last question?

16       A    What was it?

17       Q    Have you ever seen any documents that are

18   sales drafts or account applications or checks written

19   on First Union accounts, for that matter, that bear the

20   signature of Dorothy Bach?

21       A    I'm sorry if you didn't hear my response, that

22   was, no.

23       Q    Okay.  I'm sorry about that.  If you could

24   take a look at 79, document 79.

25       A    Okay.
```

1        Q      The third line says, This account seems to be
2    a fraud account but need to read the notes from fraud
3    to determine outcome.
4        A      Yes, I see it.
5        Q      Okay.  So at least at this point in time,
6    First Union is -- is still treating this thing as a
7    potential fraud account?
8        A      Correct.  Potentially there is -- there's a
9    problem.
10       Q      And the problem -- one of the problems would
11   be that the person that's listed as the card holder may
12   not have opened the account, correct?
13       A      Correct.
14       Q      And I take it First Union didn't -- didn't
15   place any weight behind the February 8th letter that --
16   that informed them that they were not Ms. Bach's
17   accounts?
18           MR. DEAL:  Objection.
19       A      I believe that there's a response to your
20   letter of February 8th a little bit later on in the
21   notes.
22       Q      Okay.  You're talking in the collection note?
23       A      Yes.  Yes.  As a matter of fact, actually, the
24   -- this very same document, 79, that you -- that you
25   mentioned --

1    Q    Uh-huh.

2    A    -- I could see where some of this work being

3    done is a response to your letter.  For instance, order

4    copy of the application opened on 5/99.  Also pulled up

5    the statements and all charges showing and pulled up

6    Emerald info.  Gave all to Bill Bothe for further

7    review.  So it looks to me like that is part of the

8    work being done to respond to your letter of February

9    8th.

10   Q    What information did First Union learn as a --

11   as a response to the February 8th letter which tended

12   to prove that Ms. Bach opened up these accounts?

13   A    The statements that would have been -- that

14   would have been received, obviously, would have had

15   Dorothy Bach's name on it.

16   Q    Okay.  But I guess my -- nobody's disputing

17   that the credit card account has the name of Dorothy

18   Bach on it since it was opened up.  I think we agree on

19   that.

20   A    Right.

21   Q    But my question is:  As a result of my letter

22   on February 8th stating that the accounts were not

23   opened up by Ms. Bach, what information did you

24   discover that would tend to prove that the accounts

25   were, in fact, opened up by Ms. Bach?

1       A      I don't think that anything was discovered.  I

2   think here on the notes it indicates that -- that this

3   was a verbal application, so I know that an application

4   was not available.

5       Q     Okay.  And there were no -- there were no

6   documents discovered that were signed by Ms. Bach?

7       A     To the best of my knowledge, correct.

8       Q     And there were no collection notes or fraud

9   notes in which Ms. Bach placed -- a call was placed to

10  Dayton number that said that these accounts were hers,

11  nothing like that was discovered, correct?

12         MR. DEAL:  Would you repeat that question

13      again, Mike?

14         THE WITNESS:  Yeah, repeat that, please.

15         MR. ECKERT:  Sure.  I apologize.

16  BY MR. ECKERT:

17      Q     There were no notes that you ran across

18  dealing with the time period after October 29th of 1999

19  which suggested that Ms. Bach told First Union that

20  these, in fact, were her accounts?

21      A     I -- I really can't answer that because I did

22  not review this, you know.  To the extent that Bill

23  Bothe, and Bill Bothe was a manager in credit card, to

24  the extent of his review, I really can't speak.  But I

25  would assume that in a case like this, when we are

Hedquist & Associates Reporters, Inc.

1    contacted by an attorney, that in addition to having

2    somebody request the application and statements, that

3    he would have gone back in the collection history to

4    look at previous work on the account.

5        Q    Okay.

6        A    But, again, I mean, I -- I -- I did not -- I

7    was not the one doing this work so I -- I can't answer

8    that.

9        Q    Why does First Union give credit to people

10   pursuant to a phone application?

11       A    I don't know. Again, that's a question on the

12   origination end.

13       Q    Okay. What verification goes into a phone

14   application to ensure that the person on the other end

15   of the phone is actually who they purport to be?

16       A    I can't answer that. The best person to

17   probably comment on that would be someone, again, on

18   the origination end. I'm not familiar with the

19   policies and procedures of the origination.

20       Q    Would you agree with me that one of the ways a

21   person could apply for a credit card account is to go

22   to a bank branch and present their driver's license or

23   request to fill out an application?

24       A    That's one way, sure.

25       Q    Okay. And would you agree with me that that

Hedquist & Associates Reporters, Inc.

```
 1    is probably a -- a safer way in the sense of preventing
 2    fraud than doing applications by telephone?
 3         A    Yes.  For that matter, also, by even doing
 4    applications by mail.
 5         Q    Okay.  So mail would be in the same -- the
 6    same vain as the phone as compared to -- to someone
 7    going in in person?
 8         A    Yeah.  Obviously, if you have someone come in
 9    in person, apply at a branch and they've got multiple
10    forms of identification, that would be the safest way
11    to -- to get information on an applicant, yes.
12         Q    And is there any -- any law that you know of
13    that requires First Union to take applications for
14    credit by telephone?
15         A    I'm not aware of any law.
16         Q    Okay.  In fact, that's just something they
17    choose to do?
18         A    My assumption is that, yes, that would be
19    correct.
20         Q    If you could take a look at document 1-0-0.
21         A    Okay.
22         Q    It says there's a notation here, 1/18/2000, as
23    per Fernando, is that you?
24         A    Yes.  Now, that's actually, I think, 4/18.  I
25    think your copy might --
```

```
 1        Q      It's a bad copy.  My apologies.  4/18/2000.

 2        A      Uh-huh.

 3        Q      As per Fernando, said no recourse on this

 4   account.  C/S is old.  And going after the

 5   granddaughter would be a great waste of money.  We are

 6   closing as an uncollectible; is that accurate?

 7        A      This is a note -- that is a notation that was

 8   entered into the system by one of my employees in

 9   Miami.

10        Q      Okay.

11        A      In the sense of the account being closed as

12   uncollectible, that -- that's an accurate statement at

13   the time.  We felt that the account was uncollectible

14   as regards to -- to Ms. Bach.

15        Q      Okay.  So at that point in time the bank had

16   taken the position that they were never going to see

17   the money that -- that came out of this account?

18        A      Correct.  We felt that based on all the

19   previous collection activity and, you know, again,

20   unfortunately, you know, her lack of cooperation as far

21   as fraud affidavit and pressing charges, you know,

22   against the granddaughter, we knew we were not going to

23   collect anything from her.  So at that point in time

24   the account was closed.

25        Q      Okay.  So at that point in time, even though
```

Hedquist & Associates Reporters, Inc.

```
 1    First Union had the -- the understanding that they
 2    weren't going to see any money on this account, they
 3    were still choosing to report adverse information
 4    against Dorothy Bach?
 5        A    Yes.  As a matter of fact, on any account that
 6    is closed as uncollectible, we would continue reporting
 7    information.
 8        Q    Okay.  Could you go to document 115?
 9        A    Okay.
10        Q    What is that document?
11        A    I'm not familiar with this.  It just looks
12    like -- it looks like some document from fraud, but
13    I've -- I've never seen this and it's not something
14    that I used in the course of my business.
15        Q    That's dated, it looks like, April of 2000?
16        A    Correct.
17        Q    Do you have any reason to dispute this
18    document, whether it shows that First Union was now
19    treating this account as a fraud account?
20        A    No.
21        Q    If you could take a look at document 118.
22        A    Okay.
23        Q    What is this document?
24        A    I am not familiar with this document.  It
25    looks like it's something that would have been
```

Hedquist & Associates Reporters, Inc.

```
 1       generated by the fraud area, fraud investigation area.

 2       But, again, I'm not -- this is not a document that I'm

 3       accustomed to work with.

 4           Q    So somebody in fraud could probably tell me

 5       what it means?

 6           A    I -- I believe so, yes.

 7           Q    Okay.  And if you could take a look at 120.

 8           A    Okay.

 9           Q    It says what happened to card, how detected,

10       do you see that towards the bottom?

11           A    Yes.

12           Q    It says, Card was stolen?

13           A    Correct.

14           Q    It says, Police report date 6/13/99?

15           A    Correct.

16           Q    And then that's the card number at the top?

17           A    Correct.

18           Q    That's one of the card numbers we've been

19       talking about --

20           A    Yes.

21           Q    -- today?  And says, Name on card, Dorothy B.

22       Bach?

23           A    Correct.

24           Q    Reported by Dorothy B. Bach?

25           A    Correct.
```

Hedquist & Associates Reporters, Inc.

```
 1        Q      And it says, Contact phone, 904-441-4980?

 2        A      Yes.

 3        Q      Does First Union have any information that

 4    Ms. Bach ever resided at -- at a place that had that

 5    phone number?

 6        A      No.

 7        Q      Is this a document that -- that anybody from

 8    First Union has looked at in trying to be able to

 9    evaluate Ms. Bach's allegations prior to the

10    lawsuit?

11        A      I do not -- I do not know that.

12        Q      Number 128.

13        A      Okay.

14        Q      Okay.  Do you see -- what is this document?

15        A      This is a document requesting a copy of the

16    application on this particular account.

17        Q      Okay.  And it says, Special handling, please

18    fax a copy of the app to Pam Lopes at phone number.

19    This is a possible fraud, trying to prove a signature.

20    Do you know what they were trying to prove there?

21        A      This was a request for the application --

22        Q      Uh-huh.

23        A      -- submitted by Pam Lopes, who was a

24    collector.  And what they were trying to do is they

25    were trying to get the application to see who signed
```

Hedquist & Associates Reporters, Inc.

```
 1   it.

 2       Q    Okay.  And they were trying to prove that -- I

 3   would think, trying to prove that Ms. Bach is the one

 4   that actually signed the application?

 5       A    Correct.

 6            MR. DEAL:  Objection, that's not a question.

 7       Q    Is that correct?

 8            MR. DEAL:  Objection.

 9            MR. ECKERT:  Let me rephrase the question.

10   BY MR. ECKERT:

11       Q    Were you trying -- was First Union trying to

12   prove that Ms. Bach signed an application or that

13   someone else signed an application with her name?

14       A    I think First Union was trying to determine

15   who signed the application, what the name of the

16   application was.

17       Q    And as a result of this -- this inquiry, did

18   First Union discover any information that would suggest

19   that Dorothy Bach was the one that opened up this

20   account?

21       A    The -- this document actually clearly shows,

22   it's written in there, unable to locate, which means

23   that the application was not located.

24       Q    And that was because it was a phone

25   application?
```

1    A    That is the assumption, correct.

2    Q    Now, after October of 1999, First Union was

3  aware that Ms. Bach resided in Ohio?

4    A    I believe that is the date, correct, that

5  showed that we spoke to her.

6    Q    Okay. On the 29th of October.

7    A    Let me just go back and -- yes.

8    Q    And you would agree with me that most of the

9  charges were made in Florida --

10    A    Correct.

11    Q    -- on this account?

12    A    Correct.

13    Q    Did that tend to suggest to First Union that

14  -- that Ms. Bach was or was not the person who was

15  making these charges?

16    A    All that we know is that someone in Florida

17  was making the charges, you know. Absent the actual

18  sales drafts, all we know is that someone was making

19  charges in Florida.

20    Q    And, in fact, First Union has never had any

21  evidence that Ms. Bach was the one that was making

22  these charges?

23    A    Correct.

24    Q    Document number 294 to 305.

25    A    Okay. Hold on a second, let me -- let me get

Hedquist & Associates Reporters, Inc.

```
 1    over there.  Okay.  I have those documents.

 2         Q    What -- what are those documents?

 3         A    I'm assuming that this is Fair Debt

 4    Collections Practices Act.  This would be a package

 5    that would be given to the collectors in their

 6    training.

 7         Q    Okay.  And on number 295, you would agree with

 8    me that it says, Although the FDCPA does not directly

 9    apply to First Union Banks, First Union will adhere to

10    the provisions of the act?

11         A    Correct.

12         Q    And this is a document that's issued by First

13    Union?

14         A    To the best of my knowledge, yes.

15         Q    Okay.  If we could go to document 306.

16         A    Uh-huh.

17         Q    What is this document?

18         A    306, the document that's dated November 1995

19    in the middle, is that the one you're looking at?

20         Q    Yeah.

21         A    Yes.  This, to me, looks to be a very old

22    guide to a collections system.

23         Q    Okay.  Is that the collections system that

24    we've been looking at previous to this in those

25    collection notes?
```

```
 1        A    No, it is not.

 2        Q    Okay.  So this -- this whole manual, that's

 3   306 through 514, what -- it has nothing to do with the

 4   system that has -- that was used with Ms. Bach?

 5        A    Correct.  I believe that this information is

 6   obsolete.  This was the old system the credit card

 7   used.  As I mentioned earlier, the system that we're

 8   looking at, the notes, that was from the FDR system.

 9        Q    Uh-huh.

10        A    To the best of my knowledge, this guide is for

11   the CPS system.

12        Q    And this is a system that was used by First

13   Union?

14        A    Yeah, before.  As a matter of fact, it says

15   here in the -- in document 308, introduction, the card

16   processing solution system, CPS.  That's -- this is the

17   old system.  This does not apply to what we've been

18   looking at.

19        Q    Okay.  Is one of the things that First Union

20   uses as a collection technique is to -- to tell people

21   that owe them money that if they don't pay the money

22   that they're going to report them to the credit

23   bureaus?

24        A    I -- I believe that it is -- I believe that

25   customers are made aware of the implications of falling
```

Hedquist & Associates Reporters, Inc.

1    behind or being delinquent in their payments.  To what

2    extent it's used as leverage, I don't know, but I do

3    know that customers are made aware that if they do not

4    keep up with their regular monthly payments as per the

5    credit card agreement, that it would have adverse

6    effects on their credit rating.

7         Q    Okay.  Is there any requirement that you know

8    of to -- that -- to warn people that you'll be

9    reporting information to credit bureaus?

10        A    That I know of, no.

11        Q    Okay.  But it's something that First Union

12   chooses to do?

13        A    It's something that we -- we advise the

14   customers of the negative implications if they fall

15   into arrears in their payments, yes.

16        Q    And, in fact, the information that you

17   transmit to credit bureaus about people who have

18   accounts that aren't paid is generally adverse

19   information to them?

20        A    It is information that -- that is adverse,

21   yes.

22        Q    Okay.  And, in fact, when you send information

23   saying that someone isn't paying you on an account that

24   you have with them, that is actually damaging their

25   credit rating?

Hedquist & Associates Reporters, Inc.

```
 1          A    It affects their credit score.

 2          Q    Okay.  Well, it doesn't raise it?

 3          A    Correct.

 4          Q    Okay.  Take a look at document number 472.

 5          A    Okay.

 6          Q    You see where it says, Past due 30 days?

 7          A    Yes.

 8          Q    It says, Your account is now two payments past

 9    due and has been reported to the credit bureau.  Please

10    send the total amount due immediately or call us at

11    1-800-829-2245.

12          A    Uh-huh.

13          Q    Is that a message that First Union uses?

14          A    Not that I'm aware of.  Not standardly.  Let

15    me just see what this document is.  Yeah, I -- I -- I

16    can't -- I can't really answer that, because, again,

17    this is a collection question on the front end.

18          Q    Uh-huh.

19          A    I do not know if this is something that the

20    collectors at one point were told to say or not to say.

21    I really -- this is a collections question.

22          Q    Well, let's look at where it says, Past due

23    150 days.

24          A    Yes.

25          Q    It says, Past balance on this account is now
```

1    six months past due.  Payment of balance must be
2    received immediately to avoid further damaging of your
3    credit rating.

4         A    I see that.

5         Q    Okay.  Would you agree with me that the --
6    that the reason that you're -- that First Union is
7    mentioning the damaging of the credit rating is to
8    encourage the people to pay their debt?

9         A    It could be to encourage them to pay their
10   debt.  It could also be from a customer service
11   perspective in letting them know and be aware of the
12   implications of not paying their debt, so that they're
13   not surprised later on if they find that -- that
14   they're, you know, being reported delinquent.  At least
15   we're giving them an opportunity to pay before -- you
16   know, before that happens.

17        Q    Okay.  Well, if this is -- if this is a First
18   Union document, a policy that they followed at one
19   point in time, and they got the 30-day notice we talked
20   about earlier, the customer would already be aware that
21   their account is being reported to the credit bureaus?

22        A    Yes.

23        Q    In fact, they'd already be aware when they got
24   their 90-day notice?

25        A    Yes.  And, again, I do not know if these were

```
 1    actual notices in writing.  Again, I -- I can't speak,
 2    this is -- this is collections' procedure and policy.
 3         Q    Okay.  Let's go back, if we could, to Exhibit
 4    A, document number 8.
 5         A    Okay.
 6         Q    Okay.  And this is a -- this is an account
 7    statement for an account in the name of Dorothy
 8    Bach?
 9         A    Yes, it is.
10         Q    Okay.  And see where it says, Please pay your
11    four-month past due account now to avoid further past
12    due reporting to the credit bureau?
13         A    Correct.
14         Q    And now it says -- on document number 10, do
15    you have that?
16         A    Yes, I see it.
17         Q    It says, This account is less than 30 days
18    away from being charged off and irreparably damaging
19    your credit rating.  Do you see where it says that?
20         A    Yes, I do.
21         Q    What is the purpose of informing someone that
22    if they don't pay that their credit rating is going to
23    be irreparably damaged?
24         A    Well, you'd be surprised once an account is
25    charged off how many times we will get disputes from
```

Hedquist & Associates Reporters, Inc.

```
 1    individuals stating, I never knew that the account was
 2    going to charge off.  You didn't tell me it was going
 3    to charge off.  Again, I think what this does, it
 4    serves -- it serves as a notice that, you know, within
 5    the next 30 days the account is going to charge off.
 6    That way, once it is charged off, if they came back two
 7    or three months later and said, I dispute my
 8    charge-off, or, you know, I was never advised that this
 9    account was going to charge off, it was going to have
10    such an effect on my credit, you know, we could
11    reference the last statement prior to charge-off and
12    say, You know what, you were -- you were -- you were
13    advised that this would happen, so.
14        Q    And what can a -- what can a card holder do to
15    prevent it from being a charge-off after -- after they
16    get this -- this notice?
17        A    They would have to cure -- they would have to
18    cure the debt.  That is, they'd have to go ahead and
19    make whatever payments are due to bring the account
20    current.  And -- and in doing so, it would -- it would
21    save this state of action from happening.
22        Q    And you, in fact, have never received a
23    payment on this credit card account from Ms. Bach?
24        A    From Ms. Bach directly, not that I know of,
25    no.
```

```
1        Q     And then document number 12 --

2        A     Yes.

3        Q     -- do you recognize that document?

4        A     That looks like the last statement showing

5    when the account charged off.

6        Q     And does it indicate anywhere in any of these

7    statements that Ms. Bach disputes that -- that these

8    accounts are hers?

9        A     On these statements, no.

10       Q     Okay.  Why is that?

11      .A     These are computer-generated statements.  And

12   to be honest, I don't know -- I don't know if it could

13   be formatted in such a way to have an entry in there

14   indicating a dispute.

15       Q     So would you agree with me that -- that a

16   charged-off account appearing on someone's credit can

17   cause irreparable damage to their credit rating?

18       A     It would -- it would not be beneficial.  It

19   would be a negative aspect of their credit report,

20   yes.

21       Q     Okay.  And we're talking about -- at least on

22   this account, we're talking about over $25,000?

23       A     Correct.

24       Q     And that's, in fact, what was reported to the

25   credit bureaus as Ms. Bach owing First Union?
```

1      A      Whatever the balance in the system was is what

2    we would have reported to the credit bureau, yes.

3      Q      Has Ms. Bach ever owed First Union any money?

4      A      No.

5      Q      What about if we could go back to, I think it

6    would be Exhibit B, document number 479.

7      A      Okay.

8      Q      At the top paragraph, it says, We are sure you

9    will agree having a good credit record is very

10   important in our world today.  Would you agree with

11   that statement or is that a false statement?

12     A      You said 479?

13     Q      Yes, 479.

14     A      Okay.  Would I agree with that statement?

15     Q      Well, does First Union agree with that

16   statement?

17     A      Yes.

18     Q      Document number 480.

19     A      Okay.

20     Q      And these -- these are examples of letters

21   that would be sent to people First Union believed owes

22   them money, correct?

23     A      Yes.  I believe that these are letters that

24   would have been sent from collections.  But, again, I

25   do not know that these were specifically the letters

```
1    sent on this account, that I do not know.
2         Q    I understand that.
3         A    Okay.
4         Q    And -- and in document 480, in the second
5    paragraph, it says, Your account is number 16 payments
6    past due for a total due of number 11.  Please send
7    this amount today, otherwise we must report an
8    unfavorable credit rating to the national credit
9    bureaus, which could result in it being more difficult
10   to obtain future credit.  Do you see that?
11        A    Yes, I do.
12        Q    And do you agree that First Union reporting
13   unfavorable credit ratings to the national credit
14   bureaus could result in it being difficult for a
15   consumer to obtain future credit?
16        A    Yes.
17        Q    And document 481 --
18        A    Okay.
19        Q    -- if it -- it says in the second paragraph,
20   If a number 9 payment is not received, we must report
21   an unfavorable credit rating to the national credit
22   bureaus.
23        A    I see that.
24        Q    Okay.  And in this -- in this type of a
25   letter, First Union would be saying, If you don't pay
```

Hedquist & Associates Reporters, Inc.

```
 1   us money, we're going to report you to the credit
 2   bureau?
 3        A    Correct.
 4        Q    And then at the bottom of that, it says, We
 5   will help in every way possible to resolve this
 6   situation.  Do you see where it says that?
 7        A    To resolve this problem, yes.
 8        Q    Okay.  Problem.  And did First Union help
 9   Ms. Bach in every way possible to resolve this -- this
10   situation?
11        A    I believe by looking at the collection
12   activity that we did.  I believe that there is numerous
13   entries, even from the collections department, where it
14   indicates that they would contact her and, you know,
15   that she would say that she didn't even know that we
16   were calling from First Union.
17        Q    Uh-huh.
18        A    She would hang up.  She was not very
19   cooperative to that extent.  And, then again, you know,
20   obviously, the fact that it was brought to her
21   attention that her granddaughter apparently had
22   perpetrated the fraud and that all we needed simply was
23   her cooperation to press charges against the
24   granddaughter and to have a fraud affidavit executed
25   and that in doing so, that would, you know, that --
```

```
1    that would rectify the situation.  The fact that she
2    never cooperated with the bank when she was told what
3    she needed to do, to me -- to me, it shows that we
4    certainly explained to her what it is that was required
5    from her to resolve the situation and she chose not --
6    not to do it.  She chose not to cooperate.
7         Q    You would agree with me that the reason why
8    the credit bureaus weren't notified that they should
9    remove the information from Ms. Bach's credit file in
10   November of 1999 was because of First Union's internal
11   policies?
12        A    In the sense that collection activities
13   continued because of what we perceived to be Ms. Bach's
14   lack of cooperation in resolving the issue, yes.
15        Q    Okay.  Can you take a look at document 484?
16        A    Yes, I have the document.
17        Q    Okay.  Your failure to -- I'm looking at the
18   third paragraph down, it says, Your failure to comply
19   with this demand may necessitate our taking legal
20   action, which may result in expense and embarrassment
21   to you.
22        A    I see it.
23        Q    Okay.  Do you know if -- if this type of a
24   letter was ever sent to Ms. Bach?
25        A    I do not know that.
```

```
 1         Q    Okay.  And is this a letter that you've ever
 2   seen First Union send out?
 3         A    I have not seen this particular letter before,
 4   no.
 5         Q    If you could take a look at document 493.
 6         A    Okay.
 7         Q    At the bottom where it says, Fraud
 8   application --
 9         A    Yes.
10         Q    -- do you know what -- what does that mean?
11         A    I -- I'm -- I do not know what this means.
12   And, again, this is the old manual, that old system.
13   And I was not familiar with that old system at all.
14         Q    Okay.  Does the new system have anything
15   termed fraud application?
16         A    It -- it may.  I'm not aware of it.
17         Q    Okay.  Who would I talk to to find that out?
18         A    Again, someone in the fraud department or
19   someone that worked the fraud department would be the
20   -- the most accurate testimony to those questions.
21         Q    Okay.  Now, would you agree with me that at
22   least in the way First Union treated Ms. Bach's
23   situation, what she was alleging was that the
24   application was fraudulently made?
25         A    That is what -- that is what she claimed, yes.
```

1    Q    She's never claimed that she opened an account

2    and then someone used it without her permission?

3         A    Correct.

4         Q    I have some other questions on this document,

5    such as the numbers 494 and on up to the end of the

6    Exhibit B, but is it fair to say that those really

7    should be directed towards somebody in the fraud

8    department or the collection department?

9         A    Yes.    If they are detailed questions regarding

10   fraud practices or collection practices, those would

11   be the -- the best individuals to ask those questions

12   of.

13        Q    Okay.    Now, do you know if the card that was

14   issued in Ms. Bach's name was a Visa or Master Card?

15        A    I believe that it was a Visa card.

16        Q    Was Visa ever notified by First Union of the

17   potential fraud in this case?

18        A    I'm not aware if they would have been or not.

19        Q    Again, that probably would be a question for

20   the fraud department?

21        A    Yes.

22        Q    If you could take a look at document number

23   521, which I'd like to actually -- strike that.    Let's

24   go back.

25             MR. ECKERT:    I'd like to introduce document

```
 1        515 through 590 as Exhibit C.

 2            MR. DEAL:  Wait a minute.  Wait a minute.  515

 3        through 590.

 4            (Plaintiff's Exhibit C was marked for

 5    identification.)

 6    BY MR. ECKERT:

 7        Q    Do you have that in front of you, Mr. Durand?

 8        A    Yes, I do.

 9            MR. DEAL:  Wait a minute.  Wait a minute.

10        Okay.  Okay.  You're calling that exhibit what?

11            MR. ECKERT:  C as in cat.

12            MR. DEAL:  Okay.

13    BY MR. ECKERT:

14        Q    Could you take a look at number 521?

15        A    Yes.

16        Q    Do you see the check up there at the top?

17        A    Yes, I do.

18        Q    Okay.  And that's drawn on the account of

19    Dorothy Bach?

20        A    Correct.

21        Q    Okay.  And that, in fact, bears the signature

22    of Dorothy Bach?

23        A    I would assume, yes.  I've never seen her

24    signature, but it's on her check.

25        Q    Okay.  Have -- have you ever seen her
```

Hedquist & Associates Reporters, Inc.

```
 1    signature on any document, other than what's -- what's
 2    on document number 521?
 3         A    No, I have not seen her signature on any other
 4    document, other than any of these checks that she may
 5    have signed.
 6         Q    Okay.  Well, I'm -- I only can see one check.
 7         A    Okay.
 8         Q    That's on 521.  If you know of other checks, I
 9    want to know about them now.
10         A    Let me look through here.  You know what?  I'm
11    looking at exactly what you sent to me.  So if --
12         Q    Okay.
13         A    Yeah, if there's nothing else in here, then
14    that's the only one.
15         Q    Okay.  Can you tell me why First Union --
16              MR. DEAL:  Mike?
17              MR. ECKERT:  I'm sorry.
18              MR. DEAL:  Just for -- just for clarification,
19         I just want to point out to you that there's also
20         another one, a Dorothy B. Bach check at 116.
21              MR. ECKERT:  116?
22              MR. DEAL:  Yeah.
23         A    Yes, I see that one also.
24         Q    Okay.  And that one's actually got a -- says,
25    Preferred bank line, what does -- what does that mean
```

```
 1    on 116?

 2       A    I don't know what that -- I don't know what

 3    that means.

 4       Q    Okay.  Do you know if that pertains to the

 5    credit card and not the checking account?

 6       A    It's hard to determine, you know, by just

 7    looking at it.  I don't -- I don't see a reference.  I

 8    really don't know.

 9       Q    Okay.  Well, it appears that First Union had

10    this document that's marked 116 probably since at least

11    the spring of 2000?

12       A    The date on it's April 5th, 2000, yes.

13       Q    Okay.  But First Union's had this because it

14    was -- it was attempted to be negotiated through First

15    Union?

16       A    That would be my assumption, yes.

17       Q    Okay.  And you don't have any reason to

18    dispute that this is a check not drawn on the checking

19    account, but on the -- on the credit card?

20       A    I really don't know what it's drawn on, to be

21    honest.

22       Q    Okay.  Well, where it says, Preferred bank

23    line --

24       A    Right.

25       Q    -- it says, XXX XXX XXX XXX 3001.
```

```
 1        A    By looking at that, you would think that it
 2   would be tied into the original account number.  I
 3   believe the original credit card account number, not
 4   the original one, the second one, I believe had a 3001
 5   ending, correct?
 6        Q    That's my understanding, too.
 7        A    Yeah.  Yeah.  It -- looking at that and making
 8   the assumption and the inference, then I would think
 9   that this would have been one of those access checks
10   tied to the -- to the credit card account number that
11   was used to make this payment.
12        Q    Did -- did First Union ever do any handwriting
13   analysis between Exhibit 116 and 0521?
14        A    Not that I know of.
15        Q    Okay.  And you have that document, October 22,
16   1999, letter from Dorothy Bach, you have that in front
17   of you, too, don't you?
18        A    I have that document, however the one that I
19   have is not -- is not signed.
20        Q    Okay.  Has -- has First Union ever tried to do
21   any type of a handwriting comparison with Ms. Bach to
22   determine whether or not the signature appearing on 116
23   is hers?
24        A    Again, I -- I don't know.  Fraud may have --
25   I'm not aware.
```

```
 1      Q    Can you tell me why no checks were ever issued
 2   on the checking account with First Union that had
 3   Ms. Bach's name printed on them?
 4      A    I don't know.
 5      Q    Okay.  Can you tell me why there were no
 6   deposit slips ever printed on the account -- the
 7   checking account with Ms. Bach's name printed on them?
 8           MR. DEAL:  Objection.
 9      A    I -- I don't know.
10      Q    Okay.  Do you know if -- if, in fact, there
11   was ever any checks or any deposit slips printed with
12   Ms. Bach's name printed on them?  When I say printed, I
13   mean typewritten.
14      A    I have no knowledge if there were or not.
15      Q    Is that anything that you ever -- First Union
16   ever looked at to try to determine whether or not these
17   accounts involved fraud?
18      A    Again, it's something that I have no knowledge
19   of.  Perhaps fraud maybe did, I -- I don't know.
20      Q    Now, at some point in time First Union became
21   aware that Ms. Bach had wired some funds to Heidi
22   Bake --
23      A    Correct.
24      Q    -- correct?
25      A    Correct.
```

Hedquist & Associates Reporters, Inc.

1        Q    But that knowledge was not known to the fraud

2   department in late 1999 and early 2000; isn't that

3   true?

4        A    I don't know that. From looking at the

5   notations, it doesn't seem that that knowledge was

6   present.

7        Q    And there's -- there's no notation in there in

8   any -- in any respect that says that fraud or

9   collections have knowledge that Ms. Bach had wired

10   money to Heidi Bake?

11        A    Correct. In the collection notes, I do not

12   recall seeing any -- any such notation.

13        Q    If you'll take a look at document 583.

14        A    Okay. I have the document.

15        Q    Okay. Do you know what that is?

16        A    I don't know what it is. Obviously, on the

17   top it says, Transaction report, but I am not familiar

18   with this document.

19        Q    Okay. And do you know what -- do you know if

20   transaction services at First Union is the one that

21   issues these types of reports?

22        A    I don't know. I mean, by looking at it,

23   obviously, the document is confirmation of a $1,000

24   credit that appears to the checking account --

25        Q    Uh-huh.

```
 1        A      -- from a Lebanon Citizens National Bank from
 2    Dorothy Bach, but, again, I'm not -- I don't know who
 3    produced this.  I don't know if it came from First
 4    Union, from Lebanon Citizens National Bank.  I would
 5    assume, given that First Union's in the top left
 6    corner, the heading says, First Union National Bank of
 7    Florida.
 8        Q      Right.
 9        A      Yes.
10        Q      And it's dated April 26th of 1999?
11        A      Correct.
12        Q      And does First Union have a department called
13    transaction services?
14        A      I'm not sure.
15        Q      Do you know who I would talk to to find that
16    out?
17        A      I would -- I could try to find out.  I mean, I
18    could see if there is such a department for you.
19        Q      Well, I'll tell you what, let's -- there's a
20    -- there's a copy of an envelope in the exhibits I sent
21    you that I'd like to mark as Exhibit F.
22               MR. DEAL:  Hold on just a second.
23        A      Yeah, let me -- let me find it.
24               MR. DEAL:  Are you talking about the one that
25               has the name that looks like Carl Bernard written
```

Hedquist & Associates Reporters, Inc.

```
 1        on it?

 2                 MR. ECKERT:   That's correct.

 3                 MR. DEAL:   Okay.   That's going to be F?

 4                 MR. ECKERT:   Yes.

 5        A     Okay.   I found it.

 6        Q     Okay.   Could you mark an F on there, or the

 7   court reporter, please?

 8        A     Done.

 9                 (Plaintiff's Exhibit F was marked for

10   identification.)

11        Q     Okay.   This envelope appears to be from First

12   Union National Bank and it says, Transaction Services,

13   Charlotte, North Carolina, do you see where it says

14   that in the upper left?

15        A     Yes, I see it.

16        Q     In the upper left of the envelope?

17        A     Yes, I see it.

18        Q     Okay.   And -- and you don't know what that

19   department is?

20        A     I really don't.

21        Q     Okay.   And you don't know what this envelope

22   could -- could deal with?

23        A     No, I do not.

24        Q     Okay.   And how would you -- how would I go

25   about finding out what this envelope dealt with?
```

```
 1        A    That is a good question.  I -- I guess
 2   probably our best bet is to see if I could find a
 3   number for you --
 4        Q    Okay.
 5        A    -- for such a department, you know.  I could
 6   go corporate on-line, directory search and see if I get
 7   any hits on transaction services.
 8        Q    If you could do that and just let Mr. Deal
 9   know, that would be -- that would be great.
10             MR. DEAL:  Mike?
11             MR. ECKERT:  Yeah.
12             MR. DEAL:  The copy I'm looking at doesn't
13        have a very legible date in the postmark.  Do you
14        have a -- can you tell me what the date is while
15        we're on this document?
16             MR. ECKERT:  Yeah, I think that the document
17        is May 3rd of '99.  Give me just a second and I'll
18        verify that, though.
19             MR. DEAL:  Okay.
20             MR. ECKERT:  I don't know.  In my notes I have
21        May 3rd of '99.  I'm not sure if I have the
22        original envelope, but if I do, I'll -- I'll let
23        you know.
24             MR. DEAL:  Okay.  So you think that, but
25        you're not certain that that's the date?
```

Hedquist & Associates Reporters, Inc.

```
 1                    MR. ECKERT:  Well, I know -- I know when I

 2          reviewed it before I remember making a note that it

 3          was May 3rd of '99.

 4                    MR. DEAL:  Okay.

 5                    MR. ECKERT:  So I'm about 99 percent positive

 6          it is.

 7                    MR. DEAL:  All right.

 8                    MR. ECKERT:  Okay.

 9     BY MR. ECKERT:

10          Q    Mr. Durand, other than this -- this envelope

11     possibly relating to the -- the wire transfer that

12     we're looking at on document number 583, do you know of

13     any other dealings First Union had with -- with

14     Ms. Bach that this might be related to?

15          A    This particular -- this particular envelope

16     and this transfer?

17          Q    Yes.

18          A    I don't know of any others.

19          Q    Okay.

20          A    But I do -- I do believe there were other wire

21     transfers, though, not just this one.

22          Q    I understand.

23          A    Okay.

24          Q    Were you directed by anybody not to request

25     the credit bureaus to remove the information that was
```

```
 1   reported regarding Ms. Bach?
 2        A     Could you repeat that, please?
 3        Q     Yes.  Were you directed by any of your
 4   supervisors not to request the credit bureaus to remove
 5   the information regarding Ms. Bach?
 6              MR. DEAL:  Now, your question, did you include
 7         counsel there?
 8              MR. ECKERT:  No.
 9              MR. DEAL:  Okay.
10        A     No, I received no instruction from any
11   superiors.
12        Q     Okay.  And is there a -- is there a written
13   policy that First Union has that in this type of a
14   situation where someone says that they did not open an
15   account that continued reporting to the credit bureaus
16   is -- is appropriate?
17        A     I'm not aware that there is or is not a policy
18   to that effect.
19        Q     Anika Harris who is listed as a witness or
20   someone who may know something about this.
21        A     Okay.  What's your question?
22        Q     Do you know who Anika Harris is?
23        A     Only from the interpretation of the collection
24   notes.  I don't -- I've never spoken to her and I don't
25   know her personally.
```

Hedquist & Associates Reporters, Inc.

1    Q    Okay.  And have you ever spoken to her about

2  Ms. Bach?

3    A    Never.

4    Q    Okay.  Now, do you -- do you have any evidence

5  to suggest that Ms. Bach opened up the checking account

6  with First Union?

7    A    No.

8    Q    Do you have any evidence to suggest that

9  Ms. Bach ever participated in her name being placed on

10  that checking account?

11    A    No, other than just her name appearing on the

12  statements a month after it was opened.

13    Q    Now, the information -- has First Union

14  requested the credit bureaus to delete the information

15  regarding Ms. Bach?

16    A    Yes, we have.

17    Q    Okay.  And when did that take place?

18    A    We got confirmation on December 3rd, 2001,

19  that the deletions had taken place.

20    Q    Okay.  And was that sent to all three credit

21  bureaus?

22    A    Yes.

23    Q    And can you tell me why that wasn't done

24  sooner than that period of time?

25    A    As I stated earlier, I believe what we were

1    looking for was, you know, something from Ms. -- from

2    Ms. Bach, you know, under oath or, you know, something

3    notarized as in the form of an affidavit that would

4    indicate that she -- you know, that she did not use the

5    account, that she did not open the account. And I

6    think that as a result of her testimony under oath,

7    that she -- that she did not give Heidi Bake

8    information to open the account or consent to open the

9    account, that was sufficient for us to go ahead and --

10   and do that deletion at that point.

11       Q    And that's pursuant to First Union's internal

12   policies?

13       A    Correct.

14       Q    And have you also requested them to delete any

15   information about the checking account?

16       A    That, I don't know if we've done or not.

17       Q    Okay. So how would you find out if -- if the

18   credit bureaus have been requested to -- to take off

19   the information about the checking account?

20       A    I would communicate with --

21            MR. DEAL:  Objection to the form of the

22       question.

23       Q    Who -- who would know at First Union whether

24   or not First Union has requested the credit bureaus to

25   remove information regarding the checking account from

Hedquist & Associates Reporters, Inc.

```
1     Ms. Bach's credit file?

2             MR. DEAL:   Objection to the form of the

3        question.

4        A     Monica Pendleton should have that knowledge.

5    Monica Pendleton is the one that put through requests

6    for deletions on the credit card account.

7        Q     When is the last time that First Union has

8    ordered a credit report regarding Ms. Bach?

9        A     I really don't know the answer to that.  Just

10   from my recollection and looking at the file that you

11   sent me, I believe it would have been that one instance

12   where the collector requested that CBI, I forgot the

13   date, it was in the collection notes.

14       Q     Okay.  Now, one of the things that came up in

15   the interrogatories was whether or not First Union had

16   done any investigation pursuant to a contact from the

17   credit bureaus, do you recall that issue generally?

18       A     Yes, I recall.

19       Q     Okay.  In the -- in the documents that have

20   been provided to you, there's -- it's the first page of

21   the -- of the exhibit, it's a letter addressed to Trans

22   Union Corporation, could you locate that set of

23   documents?

24       A     Is this the package -- yeah, it says Trans

25   Union Corporation.  It's a letter to Trans Union
```

```
1    Corporation from Ms. Bach, that document?
2        Q    Right.  Could we mark that as Exhibit G?
3             (Plaintiff's Exhibit G was marked for
4    identification.)
5             MR. DEAL:  Trans Union?
6             MR. ECKERT:  Correct.
7             THE WITNESS:  Yes.
8    BY MR. ECKERT:
9        Q    Okay.  And the first two pages appear to be a
10   letter sent to Trans Union, do you agree?
11       A    Yes.
12       Q    The second two pages appear to be a letter
13   sent to Equifax?
14       A    Yes.
15       Q    The third two seem to be a letter sent to
16   Experian?
17       A    Yes.
18       Q    Have you seen that?
19       A    Yes, I saw all three letters.
20       Q    Okay.  And then on back in the packet, there's
21   some certified mail cards, do you see those?
22       A    Yes, I see them.
23       Q    Okay.  And in the -- the second to the last
24   document is a letter sent from Trans Union to Dorothy
25   Bach, do you see that?
```

Hedquist & Associates Reporters, Inc.

```
 1        A    Yes, I do.

 2        Q    Okay.  And that's dated August 24th?

 3        A    Correct.

 4        Q    Her letter to Trans Union was dated August

 5   16th?

 6        A    Correct.

 7        Q    They're both of the year 2000?

 8        A    Yes.

 9        Q    Does First Union have any reason to dispute

10   that the August 24th letter from Trans Union was in

11   relation to her letter of August 16th?

12             MR. DEAL:  Objection to the form of the

13        question.

14        A    I have no reason to dispute it.

15        Q    Okay.  And -- and then the last -- the last

16   document is a letter from Equifax to Dorothy D. Bach,

17   dated September 8th, 2000, do you see that?

18        A    Correct.

19        Q    And do you have any -- does First Union have

20   any evidence to dispute that that was in response to

21   her letter dated August 16th?

22             MR. DEAL:  Objection.

23        A    I have no evidence.

24        Q    Okay.  And is it First Union's position that

25   they were never contacted by any credit bureaus in
```

Hedquist & Associates Reporters, Inc.

```
 1    August or September of 2000 regarding Ms. Bach?

 2         A     That is correct.  The record shows that the

 3    collection work, its history, does not show any

 4    indication that our department was contacted or that we

 5    received a consumer dispute verification form.  It's

 6    just simply not in the record.

 7         Q     Okay.  So you're saying that Trans Union and

 8    Equifax and Experian never sent you copies of these

 9    letters?

10         A     That is what the record indicates, that we

11    never received anything from the three bureaus

12    regarding this matter.

13         Q     I would imagine credit disputes would come up

14    quite often?

15         A     Yes.

16         Q     Would you agree?

17         A     Yes, they do.

18         Q     Okay.  What does the documentation look like

19    that you would get from Trans Union when a customer has

20    disputed an item on their credit report?

21         A     In actuality, there was two -- to the best of

22    my knowledge, there's two ways that that could be

23    communicated to us.  One way is in a written form

24    called a consumer dispute verification document.  And

25    it's just a -- it's a simple form that would be mailed
```

103

1    to us. And, basically, it would have the information

2    of the account in question, the dispute, the reason why

3    we dispute it. And on there it would have a section

4    where we would verify that information is being

5    accurate or not. That's one form.

6         The other form that I believe that they have

7    in communicating such information is -- is through the

8    on-line system, which I'm not very, very familiar with,

9    but I do believe there is also an on-line way of

10   communicating information.

11        Q    Okay. And -- and you're saying that you --

12   that First Union's looked at the records and they

13   didn't receive the first written documentation that

14   you're talking about?

15        A    Correct. As a matter of fact, this would have

16   transpired, you said, in August or September of 2000,

17   correct?

18        Q    Correct.

19        A    At that time the individual that would have

20   been responsible for reviewing such disputes actually

21   worked in the recovery department. And it was our

22   policy and procedure that any time any consumer dispute

23   verification form was received by the credit bureaus,

24   or for that matter a direct dispute in the form of a

25   letter from a customer, that it would be entered into

```
 1    the recovery one system.  A notation would be entered
 2    clearly depicting the date that it was received.  And
 3    then the same would be done -- on the date upon the
 4    completion of such research, a note would be entered
 5    into the file that -- that the matter was researched
 6    and what the outcome of the research was.
 7              And there is no indication -- as a matter of
 8    fact, I believe there's a gap in the record from April
 9    of 2000, I believe, to April of 2001 where there are no
10    entries at all whatsoever on the account.  One of the
11    reasons why that is, of course, is because we had
12    closed the account out.  We were not pursuing any
13    active -- any activity in the account, but there's --
14    there's just not record indicating that we received
15    anything from the credit bureaus.
16         Q    Okay.  And you said it would have been on the
17    recovery one system?
18         A    Correct.
19         Q    Is that -- do you have any documents on the
20    recovery one system that pertain to Ms. Bach?
21         A    It's actually included in one of your
22    exhibits.
23         Q    Okay.  If it's included in the exhibit, that's
24    fine.
25         A    Yeah, it's already -- I saw it.  It's already
```

Hedquist & Associates Reporters, Inc.

part of your documentation.

Q Now, you also stated that you could be notified on-line?

A I -- yes. There is a -- there is a system that would -- that would allow for that.

Q Have you -- has First Union done any investigation into whether or not there was an on-line communication from the credit bureaus regarding Ms. Bach to First Union?

A I don't know if anything was done as far as verifying, you know, whether anything was actually received on-line. But, again, if something would have been received on-line, there was one person that handled all of the credit bureau disputes for the recovery department. And the system of record was a recovery one system. Any notation and any resolution to the fact would have been entered into the recovery one system.

Q Okay. And this -- if First Union had received these letters that you're looking at here or received notice from the credit reporting agencies that Ms. Bach was disputing these accounts were hers, that -- that's not new information to First Union, is it?

A In the sense that -- in the sense that there were previous -- in the sense there was a previous

```
 1    notation on the account that there was possible fraud,

 2    no.  But, again, the record -- the record that I can

 3    see looking at the collection activity, to me, it

 4    doesn't indicate that we ever received anything from

 5    the credit bureaus requesting us to do a -- you know,

 6    an evaluation or a research on the account.

 7         Q    Okay.  And -- and based on your statement

 8    earlier that the only thing that -- that prompted First

 9    Union to remove the information regarding Ms. Bach was

10    her sworn deposition testimony, in fact, if you had

11    received this information from the credit bureaus, it

12    would not have changed the credit reporting on

13    Ms. Bach; isn't that true?

14         A    What I would have done is at that point in

15    time, we would have contacted Mr. Bach -- Ms. Bach or,

16    actually, we would have looked at the file, we would

17    have seen that you were representing her, we would have

18    contacted you and at that point in time, we would have

19    directed a fraud affidavit to you to have her execute

20    it.  And as soon as she would execute the fraud

21    affidavit statement that she did not open the account,

22    that she had no knowledge who opened it, that would

23    have been sufficient for me to go ahead at that point

24    in time and delete the account.

25         Q    Okay.  So you're saying -- you're saying that
```

```
 1      -- that if First Union would have received notice from

 2      the credit bureaus that Ms. Bach disputed this account,

 3      then she could have had it removed?

 4          A     Absolutely, if she would have been willing to

 5      go ahead and execute the fraud affidavit.  Absolutely.

 6          Q     Whose requirement is it a fraud affidavit be

 7      executed?

 8          A     Again, this is departmental policy.

 9          Q     Okay.  We're talking, again, clearly within

10      First Union?

11          A     Correct.  I also believe -- Mr. Eckert, I'm

12      not sure, that at one time when you were in

13      communication with Bill Bothe, that he had mentioned

14      something to you and it's reflected in the records

15      about a fraud affidavit, and I don't see that anything

16      ever was done with that.

17          Q     And, Mr. Durand, is it also -- is it your

18      understanding, too, that what was required to be put in

19      that affidavit was that Ms. Bach agreed to take all

20      steps necessary to cooperate -- cooperate in

21      prosecuting whoever may have done this?

22          A     Yes.

23          Q     Okay.  And, in fact, that could be interpreted

24      as requiring her to fly to Florida on her own to

25      prosecute someone who had done this?
```

```
 1         A     I -- I don't -- I can't answer that.  I don't
 2    know.  That's speculative.
 3         Q     Okay.  And, in fact, Ms. Bach would have been
 4    required by this affidavit to implicate a specific
 5    individual; isn't that true?
 6         A     If she would have known who the perpetrator of
 7    the fraud would have been, yes, we would expect her to
 8    -- to aid us identifying that person and cooperating in
 9    -- in prosecuting that person, yes.
10         Q     And what was required by the affidavit that --
11    that First Union had proposed was that Ms. Bach
12    implicate her granddaughter in -- in the theft of
13    money, isn't that what First Union was requiring?
14         A     That is correct, because of the information
15    that we received from the Ormond Beach Police
16    Department that, indeed, it was Heidi Bake that had the
17    possession of the credit card and accessed checks on
18    that account.
19         Q     And did you send Ms. Bach your collection
20    notes showing this conversation with the police
21    department?
22         A     I did not send her those notes, no.
23         Q     Do you have any record of anybody sending her
24    these notes -- at that point in time when you requested
25    the affidavit implicating her granddaughter, did you
```

Hedquist & Associates Reporters, Inc.

1    send her any proof that the police department

2    conversations actually occurred?

3         A    I don't know if proof was sent to her or not.

4         Q    And so it was -- First Union assumed that

5    Ms. Bach had to take First Union's word that, in fact,

6    this whole transaction with the police department

7    occurred?

8         A    My -- my assumption is if she would have

9    requested a copy of the police report that, you know,

10   that could have been made available to her.

11        Q    Is there any police reports that First Union

12   has?

13        A    Not that I'm aware of.

14        Q    All right.  And, in fact, First Union at the

15   time they were calling Ms. Bach up in Ohio was telling

16   her that she was responsible for these accounts; isn't

17   that true?

18        A    They were contacting her, yes.  And, again,

19   that was subsequent to -- to the fraud department not

20   handling the account anymore, based on the fact that

21   she would not execute the affidavit of fraud and -- and

22   pursue or help us pursue her granddaughter.

23        Q    In November of 1999, the collections

24   department was undergoing collection efforts trying to

25   get Ms. Bach to pay First Union money, do you agree

1    with that?

2         A    Let me take a look at the collection notes

3    back in November.

4         Q    Take November and December.

5         A    Okay.  You said November and December,

6    Counsel?

7         Q    Yeah, of 1999.

8         A    Actually, looking at the collection notes

9    specific to those months, November 3rd, 1999, there's a

10   note here from collection Miami, fraud was notified

11   since 5 of '99 card holder has been aware that

12   granddaughter has been using account.  The previous

13   notes from fraud, Twice card holder has declined to

14   press charges against her.  Now she wants copy of

15   statements, which they have been ordered already.  So

16   to that extent, I mean, it seems to me that -- that

17   that is -- you know, I don't know.  I mean, I don't see

18   a demand for payment there.

19        Q    Okay.  I don't want to cut you off, but, I

20   mean, if you want to keep going, that's fine, I'm not

21   trying to cut you off, but that kind of answered my

22   question.

23        A    Okay.  Yeah, the same thing, December 23rd,

24   '99, there was a call that was made, but, again, said,

25   Would not answer straight.  Kept beating around the

```
 1    bush.  I don't know.  I mean, I don't see any actual
 2    notes there that, you know, they were necessarily
 3    demanding her to pay.  It could very well have been
 4    that they were trying to contact her, you know, to get
 5    information or to get her to fill out the fraud
 6    affidavit.  It's just not very clear based on the
 7    collection notes.
 8         Q    Okay.  So it -- are you saying that as of
 9    October 29th, 1999, First Union was no longer seeking
10    payment from Ms. Bach?
11         A    No, that's not true.  I'm just saying that
12    during those two months it's hard to ascertain whether
13    the -- whether they were specifically trying to do that
14    or trying to get information from her to resolve this
15    matter.  I just can't tell.
16         Q    There's a document that I sent to you, it's a
17    First Union document, and on the first page it says,
18    First Union wants to work with you.  Could you take a
19    look for that?
20              MR. DEAL:  This is in the batch with your
21         cover letter?
22              MR. ECKERT:  Yes, it is.
23              MR. DEAL:  It's a one-page document.
24         A    Yes, I see it.
25         Q    Okay.
```

1          MR. DEAL:  I don't see it.

2          MR. ECKERT:  I'm sorry, let me know when you

3      find it, John.

4          MR. DEAL:  Hang on a second.  I've got it now.

5          MR. ECKERT:  Okay.  Could we mark this as

6      Exhibit H?

7          THE WITNESS:  Okay.

8          (Plaintiff's Exhibit H was marked for

9      identification.)

10  BY MR. ECKERT:

11      Q    Okay.  Do you recognize this document?

12      A    Is it -- it's not a document that I use, but I

13  do recognize this as a fixed payment plan letter that

14  would have been sent from the collections area.

15      Q    Okay.  Now, this would be a letter that First

16  Union sends out to people in an effort to try to

17  collect money from them, correct?

18      A    Correct.

19      Q    Okay.  And in this document, about two-thirds

20  of the way down, it says, Placing your account on this

21  program will eliminate further collection calls and

22  letters.  It also prevents your account from being

23  charged off and reported to the bureaus where it will

24  become a negative part of your credit history for the

25  next seven years.  Do you see that?

```
 1        A      Yes, I do.

 2        Q      When is this document sent to -- sent to the

 3   card holder?

 4        A      I can't answer that.  I don't know the

 5   specifics of when the document would be sent.  I'll

 6   tell you this, it is a fixed payment plan and it's a

 7   document that would be sent, you know, to accounts that

 8   the customer's expressed, you know, financial hardships

 9   in making their payments.  I don't know.  Where in the

10   collection cycle this would be sent, I can't answer

11   that.

12        Q      Okay.  Do you think that some of the notations

13   that we looked at before may abbreviate this type of a

14   document with a FPP?

15        A      Possibly.

16        Q      Okay.  Now, if this document were sent to

17   Ms. Bach -- first of all, do you have any -- do you

18   know if this document was sent to Ms. Bach?

19        A      I do not.  I do not know what address this was

20   sent to.

21        Q      Okay.  And is there -- is there any other

22   purpose behind sending this type of a document to a

23   card holder, other than trying to get them to pay you

24   money?

25        A      No.  This is a document to get them on a
```

114

```
 1    payment plan.
 2         Q    Okay.  And are fixed payment plans usually
 3    instituted after card privileges are suspended?
 4         A    I really can't answer that.  I don't know the
 5    answer to that.
 6         Q    Okay.  That would be a collections question?
 7         A    Yeah.  Yeah, that would be a collections
 8    question.  Obviously, it would not be sent on a current
 9    account.
10         Q    Okay.  Also in the documents, there's some
11    credit reports, do you see those?
12         A    Yes, I do.
13         Q    Okay.  If you could, could you find the CBC
14    credit report that's dated, Completed 10/22/99?
15         A    Yes, I see it.
16         Q    Okay.  And on the third -- could we mark that
17    Exhibit I?
18              (Plaintiff's Exhibit I was marked for
19    identification.)
20              MR. DEAL:  Hang on a second, Mike.  I just --
21         Q    You see it doesn't have that date on it?
22         A    There's two of them.  There's one that has the
23    date completed 6/22/2000 and one that has a date
24    completed 10/22/99.  You're referring to 10/22/99,
25    correct, Counsel?
```

```
 1                    MR. DEAL:  Okay.  I have it.

 2                    MR. ECKERT:  Okay.  Exhibit I.  We're all on

 3          the same page now.

 4          A     Yeah.  Is that the one date completed

 5      10/22/99?

 6          Q     Correct.

 7          A     Okay.

 8          Q     Down at the bottom of the -- or the middle of

 9      the third page, it says, FUNB, is that the initials for

10      First Union National Bank?

11          A     Yes, it is.

12          Q     Okay.  And it says, Line of credit?

13          A     Yes.

14          Q     Okay.  Is that the credit card?

15          A     That is one of the credit card numbers,

16      correct.

17          Q     Okay.  And then it says that, The balance

18      owing is 21,357?

19          A     Correct.

20          Q     And then the type and account status says, REV

21      01?

22          A     Correct.

23          Q     Do you know what that means?

24          A     I really -- I'm not familiar with this report.

25      I really -- I wouldn't want to guess.
```

Hedquist & Associates Reporters, Inc.

```
1         Q    Okay.   And it says, Date reported 7/99, do you
2    see that, the first column?
3         A    Yes.   Yes, I see it.
4         Q    Okay.   Now, the next document would be the CBC
5    credit report dated 6/22/2000.   Can we mark that as
6    Exhibit J?
7         A    Okay.   I have it.
8              (Plaintiff's Exhibit J was marked for
9    identification.)
10        Q    Okay.   And, now, the first two items in credit
11   history on the first page says, First Union Direct B,
12   do you know what that stands for?
13        A    Direct bank.
14        Q    Okay.   And then the next one down says, First
15   Union National?
16        A    Correct.
17        Q    And then the -- the first entry is reporting
18   as a charge-off?
19        A    Yes.
20        Q    Okay.   And that's the -- the negative thing
21   that we were talking about earlier that can affect
22   somebody's credit?
23        A    Correct.
24        Q    And you were -- First Union was reporting
25   this, it looks like, as of May of 2000?
```

```
 1         A    That is correct.

 2         Q    If you could take a look at the credit report

 3    Trans Union printed on 9/13/2000.

 4         A    Okay.  I have it.

 5         Q    Okay.  And on this one on the first page --

 6         A    Are we going to mark this as an exhibit?

 7         Q    Yeah.  Let's mark that K.

 8         A    Okay.  Done.

 9              (Plaintiff's Exhibit K was marked for

10    identification.)

11         Q    Okay.  Where it says, We have completed our

12    re-investigation and the results are shown below, are

13    -- are you aware of any re-investigation that ever

14    occurred on this account?

15              MR. DEAL:  Where are you reading, Mike?

16              MR. ECKERT:  We're in the middle of the page.

17              MR. DEAL:  Middle of which page?

18              MR. ECKERT:  The first page.

19              MR. DEAL:  Okay.

20    BY MR. ECKERT:

21         Q    It says, Investigation results, and then it

22    says, We have completed our re-investigation and the

23    results are shown below.  Do you see that?

24         A    I -- I see it.

25         Q    Okay.  And your -- your testimony is that
```

```
 1     First Union never participated in any type of a
 2     re-investigation of these accounts in September of
 3     2000?
 4          A    Correct, that's what the record indicates.
 5     There's no -- there's no record to that effect.
 6          Q    Okay.  And, then, also at least according to
 7     this report, it's saying, In regards to First Union,
 8     and the account ending 5909, that there's new
 9     information below.
10          A    I see that.
11          Q    Okay.  Do you know of any information that
12     was transmitted to the credit bureaus in September of
13     2000?
14          A    I -- I do not.
15          Q    Okay.  Could you turn the page, please?
16          A    Sure.
17          Q    At the top of the page, it says, FUNB, dash,
18     DB --
19          A    Yes.
20          Q    -- profit and loss write-off?
21          A    Yes.
22          Q    Is that something that First National -- or
23     First Union would report to the credit bureaus, that
24     it's a profit and loss write-off?
25          A    Yes, that is the equivalent of a charge-off.
```

```
 1        Q    Okay.  But, I mean, is -- can you think of any
 2   other source where the credit bureaus would have gotten
 3   that, other than from First Union?
 4        A    I -- I can't think of any.
 5        Q    Okay.  And do you see where right underneath
 6   it, it says, Verified 9/2000?
 7        A    Correct.
 8        Q    So is it First Union's position that the
 9   credit union was inaccurate in saying that this was
10   verified in 9 of 2000?
11        A    It's our position that we don't have any
12   records that indicate an investigation took place or
13   that we were contacted to perform such investigation.
14   It's just simply not part of our record.
15        Q    Okay.  But other than the fact that you guys
16   don't have any documentation to that effect, do you
17   have any other reason to dispute the credit bureau's
18   statement that this was verified in 9 of 2000?
19        A    No, no reason to dispute.
20        Q    I'd like to mark as Exhibit L the credit --
21   looks like credit scope report --
22        A    Yes.
23        Q    -- dated 10/3.
24        A    Okay.  It's done.
25                  (Plaintiff's Exhibit L was marked for
```

```
 1    identification.)
 2         Q    Okay.  And then also the first entry in that
 3    credit history is FUNB, do you see that?
 4         A    Yes, I do.
 5         Q    It also indicates charged-off account?
 6         A    Yes.
 7         Q    And then it's reported in October of 2000?
 8         A    Correct.
 9         Q    Okay.  Do you have any reason to dispute that
10    First Union reported to the credit bureaus in October
11    of 2000 that Ms. Bach held a charged-off account with
12    them?
13         A    No.
14         Q    If you could look at the second page, towards
15    the bottom.
16         A    Yes.
17         Q    It appears there's an entry in inquiries, it
18    says, FU-BKCD, what does that mean?
19              MR. DEAL:  Where are you now?
20              MR. ECKERT:  At the bottom of the second page.
21              MR. DEAL:  Okay.  I see it.
22         A    Yeah, it's kind of faded.  That would be an
23    inquiry by First Union Bank card collections that took
24    place on that date.
25         Q    Okay.  Did First Union ever have any
```

Hedquist & Associates Reporters, Inc.

```
 1    authorization from Ms. Bach to make that particular
 2    inquiry?
 3         A    No.
 4         Q    And then if we could look at the next page,
 5    middle of the page, right-hand column, it says, FUNB,
 6    and then it has a date of 5/18/99.
 7         A    Yes, I see that.
 8         Q    Okay.  And is that First -- First Union agrees
 9    that that's probably the credit check that they did
10    before issuing the credit card?
11         A    For certain, I don't know, but it's -- it's
12    quite possible.  It's around the -- it's around the
13    opening date.
14         Q    Do you know of any authorization that Ms. Bach
15    gave First Union to pull that credit report?
16         A    No.
17         Q    If we could take a look at the next credit
18    scope report, dated October 19th.  Mark that as Exhibit
19    M.
20         A    Okay.
21              (Plaintiff's Exhibit M was marked for
22    identification.)
23         Q    We have -- this is, basically, just taken
24    about two weeks after the first one, would you agree?
25         A    Yes.  The first one was dated 10/3, this one's
```

```
 1   dated 10/19.
 2        Q    And do you have any reason to dispute that the
 3   information that's contained on here dealing with First
 4   Union is what First Union reported to the credit
 5   bureau?
 6        A    I have no reason to dispute it.
 7        Q    If we could take a look at Exhibit -- it'll be
 8   Exhibit N, which is the residential mortgage credit
 9   report.
10        A    Okay.
11             (Plaintiff's Exhibit N was marked for
12   identification.)
13        Q    The legal size document, do you see that?
14        A    Yes, I have it.
15        Q    It's dated March 20th, 2001.
16        A    Correct.
17        Q    This -- the second page of that exhibit has a
18   First Union entry towards the middle of the page, do
19   you see that?
20        A    Yes.  The first entry you're referring to?
21        Q    Correct.
22        A    Okay.
23        Q    It says, Charge-off.
24        A    Yes.
25        Q    Okay.  Now, does this relate to the checking
```

```
 1    account?

 2         A    It looks like that's the checking account

 3    number.

 4         Q    Okay.  Now, do you know who Kelly is that has

 5    this phone number here?

 6         A    I do not.

 7         Q    The -- the third page of that exhibit --

 8         A    Yes, I see it.

 9         Q    Okay.  Do you see the FUNB-DB entry?

10         A    Yes, I do.

11         Q    Okay.  And it says, Date reported is March of

12    2001.

13         A    Correct.

14         Q    Okay.  And this is saying that it's -- it's a

15    charged-off account?

16         A    Yes, it is.

17         Q    So at least as late of March of 2001, First

18    Union is still reporting to the credit bureaus that

19    Ms. Bach has a charged-off account?

20         A    Correct.

21         Q    And a charged-off account is another way of

22    basically saying that she has a bad debt?

23         A    Yes.

24         Q    Okay.  If we could look at the Trans Union

25    file report dated June 6th of 2001.
```

Hedquist & Associates Reporters, Inc.

1      A    Yes.

2      Q    Can we mark that as Exhibit O, please?

3      A    Done.

4           (Plaintiff's Exhibit O was marked for

5    identification.)

6      Q    Okay.  And -- and this one says, at least in

7    the middle, that, The FUNB-DB account information was

8    deleted.

9      A    Correct.

10     Q    Okay.  Is that something that First Union

11   requested?

12     A    I do not know.

13     Q    And who would know that?

14     A    That is a good question.  It could be customer

15   service.  I just simply -- I mean, obviously, it's

16   deleted, but I don't know who at First Union would have

17   requested that to be deleted, if, indeed, we did.

18     Q    Okay.  And then at the bottom of that little

19   list there, it says, FUNB recovery is deleted?

20     A    Correct.

21     Q    Okay.  And then this -- at least as of June of

22   2001, the Trans Union's credit file, First Union's

23   information was deleted?

24     A    Correct.

25     Q    Did First Union at any time object to the

```
 1    deletion of information regarding Ms. Bach?

 2         A    Not that I know of.

 3         Q    Does First Union dispute that prior to June

 4    6th of 2001 it requested Trans Union to delete the

 5    information regarding Ms. Bach?

 6         A    Repeat that, please.

 7         Q    Sure.  Does First Union dispute that at some

 8    time prior to June 6th of 2001 that it requested Trans

 9    Union to remove the information regarding Ms. Bach?

10         A    I can't dispute that.  I just simply don't

11    know who would have made that request.

12         Q    Her deposition didn't occur until after June

13    6th of 2001; isn't that true?

14         A    To be honest, I don't know the date of her

15    deposition.

16         Q    If you could take a look, there's a -- there's

17    a printout from First Union's website I'd like to mark

18    as Exhibit P.

19         A    Hold on one second, let me get that.

20         Q    It's entitled Corporate Overview.

21         A    Okay.  I have it.

22              (Plaintiff's Exhibit P was marked for

23    identification.)

24         Q    Okay.  Does First Union agree this is a

25    printout from their website?
```

Hedquist & Associates Reporters, Inc.

```
 1        A     It appears to be, yes.

 2        Q     Okay.  And you would agree, at least at this

 3   -- the time of this printout, that First Union was

 4   holding itself out as the nation's sixth largest

 5   banking company?

 6        A     That's what the website says, yes.

 7        Q     Do you -- do you have any information to

 8   dispute that?

 9        A     No.

10        Q     Okay.  Then it had assets of 254 billion at

11   December 3rd of 2000?

12        A     Correct.

13        Q     You don't have any information to disagree

14   with that?

15        A     No.

16        Q     Do you know what -- what -- strike that.

17              Do you know that Ms. Bach also had an account

18   established in her name without her permission with

19   American Express?

20        A     I think I saw something in the file that you

21   sent me to that effect.  But prior to that, I -- I did

22   not know that.

23        Q     Okay.  If you could take a look at -- there's

24   a set of documents that I provided to you dated October

25   22nd of 1999.  It says -- addressed to American
```

Hedquist & Associates Reporters, Inc.

```
 1    Express, do you see that?
 2         A    Yeah, let me look through them.  Okay.  Yeah,
 3    I see the document.
 4         Q    Okay.  Can we mark that as Exhibit Q?
 5         A    Okay.
 6              (Plaintiff's Exhibit Q was marked for
 7    identification.)
 8         Q    It appears, at least based on this document,
 9    that the first one is dated October 22nd, 1999?
10         A    Yes.
11         Q    And then the -- the last document is dated
12    December 15th, 1999?
13         A    Correct.
14         Q    And the second paragraph in that document
15    says, We are pleased to advise you that we've
16    instructed the credit reporting agencies listed below
17    to delete all information pertaining to this account as
18    it is erroneously included on your credit report.
19         A    Yes.
20         Q    Do you see that?
21         A    Yes, I do.
22         Q    Okay.  Can you tell me what the industry
23    standard is as far as correcting errors on people's
24    credit reports and what information is necessary before
25    you're able to do that?
```

```
 1        A      To the best of my knowledge, under the FCRA, I
 2   believe we have either 20 or 30 days to review a credit
 3   dispute once we receive notification from the credit
 4   bureaus.  As far as what goes into the review process,
 5   I believe that -- that pretty much every institution
 6   has -- you know, has different -- different policies
 7   and procedures as to what they look at as far as
 8   verification.
 9        Q      Okay.  And would it surprise you if -- if you
10   found out that she had this same type of dispute with
11   American Express and it got resolved in less than two
12   months?
13        A      Would it surprise me?  No.
14        Q      Okay.  And would it surprise you that American
15   Express doesn't require an affidavit implicating the
16   person who opened the account?
17        A      It wouldn't surprise me.
18        Q      You said it would not?
19        A      Yeah.  It would not surprise me.
20        Q      We're getting real close here.  Appreciate
21   your patience.
22        A      Not a problem.
23        Q      Also, finally, I guess the final exhibit would
24   be the request for admissions that you have in front of
25   you.
```

```
1          A     Okay.

2          Q     Do you see that?

3          A     Yes, I do.

4          Q     Okay.  If you could take a look at -- well,

5     mark that Exhibit R first.

6          A     Okay.

7                (Plaintiff's Exhibit R was marked for

8     identification.)

9          Q     Take a look at request for admission

10    number 4.

11         A     Yes.

12         Q     It says, Dorothy B. Bach never authorized

13    anyone to open any account with any of the defendants.

14    And First Union has responded, First Union is unable to

15    admit or deny.  Has First Union ever had any knowledge

16    whether or not Ms. Bach authorized anyone to open up

17    any of the accounts with First Union?

18         A     No, we don't have any knowledge that she

19    authorized, but we also don't have any knowledge that

20    she didn't authorize.

21         Q     Okay.  In short, First Union never knew?

22         A     Correct.

23         Q     And you never knew if -- First Union never

24    knew if she even opened up any accounts with First

25    Union?
```

```
1          A     Correct.

2          Q     At this point in time does First Union contend

3     that Ms. Bach owes them money pertaining to the

4     checking account?

5          A     I don't think that at this point in time we'll

6     hold her liable for that checking account, no.

7          Q     Has First Union ever thought that she was

8     responsible for the monies owed on the checking

9     account?

10         A     I did not work that checking account, so I

11    don't know, you know, what the work process is on it.

12    I really can't answer that.  Are you still there?

13         Q     Yeah, I'm still here.  The more pauses I take,

14    the sooner we're close to being done.

15             MR. ECKERT:  Okay.  Mr. Durand, that's all the

16         questions I have for you right now.  I do

17         appreciate your cooperation in getting this set up

18         and everything, it's made it a lot easier and I

19         know you didn't have to travel, so that's a help

20         out to you.

21             THE WITNESS:  Oh, absolutely.

22             MR. ECKERT:  I may have some questions

23         regarding the ones I posed to you that you were

24         unable to answer, which I can talk to John about,

25         about the collection and the fraud questions, but I
```

```
 1        do appreciate your time.  And the court reporter

 2        can advise you on your right to sign and review the

 3        transcript.

 4             MR. DEAL:  Mike, would you -- would you follow

 5        up with a letter?  There are two or three or four

 6        items where we talked about getting some documents

 7        or going back, would you follow that up with a

 8        letter so we could make sure we've got everything

 9        you're asking for?

10             MR. ECKERT:  Yeah, I'd be glad to.  I may not

11        have had a running tally, but I'd like to order the

12        deposition.  And as soon as I get that, I'll be

13        glad to do that.

14             MR. DEAL:  Okay.  As long as you're ordering

15        it, we, of course, would like a copy.  I don't know

16        what the timing is, but I think we've got a -- like

17        a first of the month deadline to move for summary

18        judgment, so I'd like to make sure we get the

19        transcript not later than -- gees, this is the 9th,

20        would we be able to have that by the 21st?

21             THE REPORTER:  Yes.

22             (Witness excused.)

23             (The deposition was concluded at 4:52 p.m.)

24

25
```

Hedquist & Associates Reporters, Inc.

1                  CERTIFICATE OF OATH

2     STATE OF FLORIDA)

3     COUNTY OF DUVAL )

4

5          I, the undersigned authority, certify that

6     FERNANDO DURAND personally appeared before me and was

7     duly sworn.

8

9          WITNESS my hand and official seal this 16th

10    day of January, 2002.

11

12

13

14

15

16

17

18    Terrie L. Cook, RPR, CRR, CSR (GA)
      Notary Public-State of Florida
19    B-2192 - Expires 3/31/02

20

21                      TERRIE L. COOK
                        MY COMMISSION # CC 948288
22                      EXPIRES: September 27, 2004
                        Bonded Thru Notary Public Underwriters

23

24

25

Hedquist & Associates Reporters, Inc.

1                   REPORTER'S CERTIFICATE

2

3      STATE OF FLORIDA

4      COUNTY OF DUVAL

5

6              I, Terrie L. Cook, RPR, CRR, CSR (GA), certify

7      that I was authorized to and did stenographically

8      report the deposition of FERNANDO DURAND; that a review

9      of the transcript was requested; and that the

10     transcript is a true and complete record of my

11     stenographic notes.

12

13             I further certify that I am not a relative,

14     employee, attorney, or counsel of any of the parties,

15     nor am I a relative or employee of any of the parties'

16     attorney or counsel connected with the action, nor am I

17     financially interested in the action.

18

19             DATED this 16th day of January, 2002.

20

21

22

23     _____
       Terrie L. Cook, RPR, CRR, CSR (GA)

24

25

Hedquist & Associates Reporters, Inc.

```
 1                    E R R A T A   S H E E T

 2      STATE OF FLORIDA

 3      COUNTY OF DUVAL

 4

 5              I, FERNANDO DURAND, the undersigned deponent,

 6      have this date read the foregoing pages of my

 7      deposition, numbered 1 through 131, and with the

 8      suggestions noted below, if any, these constitute a

 9      true and accurate transcription of my deposition given

10      on the 9th day of January, 2002, at the time and place

11      stated therein.

12

13      PAGE NUMBER    LINE NUMBER    SUGGESTION/REASON

14

15

16

17

18

19

20

21                    _____

22                          FERNANDO DURAND

23      cc: tlc

24

25
```

Hedquist & Associates Reporters, Inc.